UNITED STATES ET AL. *v.* ALLEGHENY-LUDLUM
STEEL CORP. ET AL.

No. 71–227.   Argued March 27, 1972—Decided June 7, 1972

REHNQUIST, J., delivered the opinion for a unanimous Court.

*Samuel Huntington* argued the cause for the United States et al.   With him on the briefs were *Solicitor General Griswold, Assistant Attorney General McLaren, Acting Assistant Attorney General Comegys, Fritz R. Kahn, Betty Jo Christian,* and *James F. Tao.*

*Max O. Truitt, Jr.,* and *William M. Moloney* argued the cause for appellees.   With *Mr. Truitt* on the brief for appellees Allegheny-Ludlum Steel Corp. et al. was *Sally Katzen.*   With *Mr. Moloney* on the brief for appellee Association of American Railroads were *James I. Collier, Jr.,* and *Gordon E. Neuenschwander.   John F. Donelan* filed a brief for appellee National Industrial Traffic League.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1969 the Interstate Commerce Commission promulgated two "car service rules" that would have the

general effect of requiring that freight cars, after being unloaded, be returned in the direction of the lines of the road owning the cars. Several railroads and shippers instituted two separate suits under 28 U. S. C. §§ 2321–2325 to enjoin enforcement of these rules. In *Florida East Coast R. Co.* v. *United States,* 327 F. Supp. 1076 (MD Fla. 1971), the action of the Commission was sustained by a three-judge court, but in the case now before us a similar court for the Western District of Pennsylvania held the Commission's order invalid. 325 F. Supp. 352 (WD Pa. 1971). We noted probable jurisdiction, 404 U. S. 937, and for the reasons hereinafter stated we conclude that the Commission's action here challenged was within the scope of the authority conferred upon it by Congress and conformed to procedural requirements.

The country's railroads long ago abandoned the custom of shifting freight between the cars of connecting roads, and adopted the practice of shipping the same loaded car over connecting lines to its ultimate destination. The freight cars of the Nation thus became in essence a single common pool, used by all roads. This practice necessarily required some arrangements for eventual return of a freight car to the lines of the road which owned it, and in 1902 the railroads through their trade association dealt with this and related problems in a code of car-service rules with which the roads agreed among themselves to comply. The effect of the Commission's order now under review is to promulgate two of these rules[1] as the Commission's own, with the result that sanctions attach to their violation by the railroads.

---

[1] "Rule 1. Foreign cars, empty at a junction with the home road, must be:

"(a) Loaded at that junction to or via home rails, or,

"(b) Delivered empty at that junction to home road, except in

Because of critical freight-car shortages experienced during World War I, Congress enacted the Esch Car Service Act of 1917, which empowered the Commission to establish reasonable rules and practices with respect to car service by railroads. 40 Stat. 101, 49 U. S. C. § 1 (14)(a). The pertinent language of that Act provides:

> "The Commission may . . . establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter . . . ."

No party to this proceeding has questioned that the rules promulgated by the Commission are "rules, regulations, and practices with respect to car service," and therefore the issue before us is whether these rules are "reasonable" as that term is used in the Esch Act. The court below concluded, and the appellees here contend, that for a number of reasons the rules in question do not meet the statutory requirement of reasonableness. Appellees also contend that the findings of the Com-

---

instances where Rule 6 has been invoked, or unless otherwise agreed by roads involved.

"Rule 2. Foreign empty cars other than those covered in Rule 1 shall be:

"(a) Loaded to or via owner's rails.

"(b) Loaded to a destination closer to owner's rails than is the loading station or delivered empty to a short line or switch loading road for such loading. (Car Selection Chart is designed to aid in so selecting cars for loading.)

"(c) Delivered empty to the home road at any junction subject to Rule 6.

"(d) Delivered empty to the road from which originally received under load, at the junction where received, *Except* that when handled in road haul service, cars of direct connection ownership may not be delivered empty to a road which does not have a direct connection with the car owner.

"(e) Returned empty to the delivering road when handled only in switching service." Jurisdictional Statement 64.

mission are insufficient under the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.*

The record of proceedings before the Commission establishes that the Commission has been increasingly concerned with recurring shortages of freight cars available to serve the Nation's shippers. It found that shortages of varying duration and severity occur both as an annual phenomenon at peak loading periods and also during times of national emergency. The result of these shortages has been that roads were unable to promptly supply freight cars to shippers who had need of them.

Underlying these chronic shortages of available freight cars, the Commission found, was an inadequate supply of freight cars owned by the Nation's railroads. The Commission concluded that one of the principal factors causing this inadequate supply of freight cars was the operation of the national car-pool system. In practice this system resulted in freight cars being on lines other than those of the owning road for long periods of time, since the rules providing for the return of unloaded freight cars in the direction of the lines of the owning road were observed more often than not in the breach. Since the owning road was deprived of the use of its own freight cars for extended periods of time, the Commission found, there was very little incentive for it to acquire new freight cars. In addition, since a road which owned a supply of freight cars inadequate to serve its own on-line shippers could generally, by hook or by crook, arrange to utilize cars owned by other roads, the national car-pool system significantly reduced the normal incentive for a railroad to acquire sufficient equipment to serve its customers. The rules promulgated by the Commission are intended to make those railroads whose undersupply of freight cars contributes to the national shortage more directly feel the

pinch resulting from the shortage that they have helped to cause. By thus requiring each road to face up to any inadequacies in its ownership of freight cars, the rules are intended in the long run to correct the nationwide short supply of freight cars that the Commission has found to exist.

Central to the justification for the Commission's promulgation of these rules is its finding that there was a nationwide shortage of freight car ownership. The court below assumed the correctness of that finding, and we conclude that it was supported by substantial evidence.

Shortly after the Second World War, the Commission conducted an investigation into the adequacy of freight car supply and utilization by the Nation's railroads. The Commission in that proceeding concluded that there was "an inadequacy in freight car ownership by rail carriers as a group." Recognizing that this inadequacy was caused at least in part by the inability of the railroads to acquire new equipment, first during an era of wartime demand and then during an era of post-war boom, the Commission at that time imposed no obligation on the railroads except to require them to file with it their rules and regulations with respect to car service.

In 1963 the Commission began this investigation into the adequacy of car ownership, distribution, and utilization. At the conclusion of the investigatory phase of the proceeding in 1964, the Commission determined that there was a shortage of freight cars in general service. 323 I. C. C. 48 (1964). Formal notification of proposed rulemaking was then issued, and a questionnaire was submitted to the various railroads for the purpose of compiling data on car ownership and use. After these data were gathered, railroads, shippers, and other interested parties were permitted to file verified statements providing further factual material and to adduce

legal arguments. The Commission, through its Bureau of Operations, presented to the Hearing Examiner tabular collations of the freight car ownership and use data, and suggested a formula by which a railroad might compute the sufficiency of its freight car ownership. The Bureau also proposed that the entire Code of Car Service Rules adopted by the Association of American Railroads be promulgated by the Commission for mandatory observance.

Many railroads and shippers opposed mandatory enforcement of the rules. Some roads and shippers appeared in favor of at least some mandatory enforcement of the rules, arguing that unless some compulsion were used in enforcing them, cars purchased by a railroad for use by its shippers would continue to be detained for inordinately long periods of time by other roads.

After 50 days of hearings, the Trial Examiner issued his report, recommending against mandatory enforcement of the car-service rules. Although the Commission, prior to referring the matter to him, had previously made a definitive finding that a shortage of freight cars existed, the Examiner's report stated that there was no competent evidence in the record developed before him upon which such a determination could be made. The Examiner assigned several reasons for recommending against mandatory enforcement of the rules.

The Commission issued a comprehensive opinion disagreeing with the trial examiner in many respects, and ordering that two of the car-service rules be promulgated as rules of the Commission with sanctions attaching to noncompliance. Finding that "[t]he continuing relocation of cars on owner's lines is of major importance to the maintenance of an adequate car supply," [2] the Commis-

---

[2] 335 I. C. C. 264, 293 (1969).

sion concluded that the inconveniences feared by the shippers were outweighed by the long-term benefit that would accrue from the mandatory enforcement of the two car-service rules.

After its first order adopting the two rules was issued, the Commission considered claims that there was need for some procedure for exceptions to the mandatory enforcement of the rules. A supplemental order that established another rule that permitted the railroads to seek exception from the Commission's Bureau of Operations, in order to alleviate inequities and hardships.[3]

The court below held that the rules were not "reasonable," as that term is used in the Esch Act, for three reasons. First, although there was a general finding of a nationwide freight car shortage, the court said that a specific shortage on owner lines should have been found in order to justify the promulgation of these rules. Second, it said there should have been a finding as to the financial effects upon the railroads and shippers who would be affected by the rules. Finally, it supported its conclusion that the rules were not "reasonable" by the fact that even though violation of the rules could be enforced by monetary penalties, the Commission nonetheless conceded that obtaining complete compliance with them would be impossible.

The standard of judicial review for actions of the Interstate Commerce Commission in general, *Western Chemical Co.* v. *United States,* 271 U. S. 268 (1926),

---

[3] "Rule 19—Exceptions

"Exceptions to the rules (prescribed by the Interstate Commerce Commission for mandatory observance) for the purpose of further improving car supply and utilization, increasing availability of cars to their owners, improving the efficiency of railroad operations, or alleviating inequities or hardships, may be authorized by the Director or Assistant Director of the Bureau of Operations, Interstate Commerce Commission, Washington, D. C." Jurisdictional Statement 172.

and for actions taken by the Commission under the authority of the Esch Act in particular, *Assigned Car Cases,* 274 U. S. 564 (1927), is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported. In judicially reviewing these particular rules promulgated by the Commission, we must be alert to the differing standard governing review of the Commission's exercise of its rulemaking authority, on the one hand, and that governing its adjudicatory function, on the other:

> "In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general." *Assigned Car Cases, supra,* at 583.

The finding of the Commission as to a nationwide shortage of freight cars was based primarily on data submitted by the railroads themselves covering the years 1955 through 1964. Over this 10-year period total freight car ownership of Class I railroads dropped 12.4%, and aggregate carrying capacity of those railroads dropped 5%. Over the same period revenue tons orig-

inated dropped 2.9%. The decline in ownership of plain box cars, as opposed to more sophisticated types of cars, was even more dramatic; ownership of cars over the 10-year period in question dropped 22.1%, while aggregate carrying capacity of such cars dropped 18.9%. Testimony of witnesses for the National Industrial Traffic League, the Western Wood Products Association, the American Plywood Association, and the Vulcan Materials Association also supported the finding of a car shortage. These statistics, taken together with the Commission's post-war determination of a car shortage, portray a gradually worsening ratio of carrying capacity to revenue tons originated.

The Commission further found that freight car shortages, in the sense that a particular road was unable to promptly supply freight cars to particular shippers who needed them, have occurred chronically, both during peak loading seasons each year and during times of national emergency. It is quite true, as appellees suggest, that inability of the roads to supply cars to shippers at particular times is not conclusive evidence that there is a national shortage of freight car ownership. Conceivably, freight car ownership could be adequate, yet poor utilization of the supply could result in shortages. Nonetheless, the Commission may fairly rely on these chronic shortages in availability of freight cars as one factor upon which to base its conclusion that there was an overall shortage of ownership of freight cars.

The Commission also found that a surprisingly low percentage of freight cars was actually on the tracks of the roads owning the cars at any given time, and that this percentage had been decreasing during the period in question. In March 1966, less than 30% of the railroads' plain box cars were on the line of their owner, and during the preceding year that percentage

remained mostly in the low thirties. The Commission summarized the factual situation it found in these words:

"From the evidence adduced and the data collected, it is obvious that an adequate freight car supply is as much a problem today as it was during the period considered in our last proceeding in 1947. Car service which involves a shortage of approximately one out of every ten cars ordered or even one out of every fifteen cars ordered demands that every available means be marshalled to eliminate such deficiencies." 335 I. C. C., at 285.

One of the means marshaled by the Commission to eliminate such deficiencies was the promulgation of the two rules under attack here. The thrust of these rules is to require that freight cars after unloading be dispatched in the direction of the lines of the owning road.

Thus, the Commission concluded after investigation that the railroads were frequently unable to supply shippers with freight cars. It reasoned from this fact, and from statistics showing a significantly more rapid decline in aggregate carrying capacity than in revenue tons originated, that an underlying and important cause of the unavailability of box cars to shippers was that the Nation's railroads simply did not jointly own a sufficient number of freight cars to adequately serve shippers of goods over their lines. Because of the existence of the national pool of freight cars, whereby roads may service on-line shippers with foreign cars, it was difficult, if not impossible, to relate inadequate ownership statistically to any particular road or roads. The Commission therefore chose to make mandatory two of the car-service rules that would have the effect of aligning more closely than at present the ownership of freight cars on the part of the road with the availability of those freight cars to the own-

ing road for use of its on-line shippers. The result of these rules, over the long term, the Commission reasoned, would be to bring home to those roads which themselves had an inadequate supply of cars to serve their on-line shippers that fact, and also without doubt to supply incentive to such roads to augment their supply of freight cars in order to adequately serve their on-line shippers. The national supply of freight cars would thereby be augmented, and the railroads as a result would be better able to supply the needs of shippers.

Appellees' fundamental substantive contention is that the short-term consequences of the enforcement of these rules will so seriously disrupt established industry practices as to outweigh any possible long-term benefits in service that might accrue from them, and that therefore the rules are not "reasonable" as that term is used in the Esch Act.[4] While, of course, conceding that the railroads themselves originally promulgated the rules for voluntary compliance, appellees argue that because the rules have been observed largely in the breach, usages and practices have grown up that permit far more efficient utilization of the existing fleet of freight cars than would be permitted if the two rules in question were enforced by the Commission. Appellees state that in reliance on the existence of a national pool of freight cars, and on the consequent availability to shippers of cars not owned by the line originating the shipment, manufacturing plants have been located and enlarged.

---

[4] Three separate briefs have been filed here in support of appellees, each of which understandably presents the case for affirmance in slightly differing form, and no one of which completely adopts the reasoning of the District Court. We have not found it necessary in deciding the case to deal with each separate argument in support of affirmance, since we believe all of them to be generally subsumed under those claims with which we deal.

They claim that enforcement of the rules now would seriously hamper the movement of freight traffic from these and other shipping points.

It may be conceded that the immediate effect of the Commission's order will be to disrupt some established practices with respect to the handling and routing of freight cars, and on occasion to cause serious inconvenience to shippers and railroads alike. If the Commission were thrusting these regulations upon an admittedly smoothly functioning transportation industry, well supplied with necessary rolling stock and adequately serving all shippers, the rationality of its action might well be open to question.

But such is not the case. The Commission's finding that there are recurring periods of significant length when there is not an adequate freight car supply to service shippers is supported by substantial evidence. While the flexible system of routing freight cars presently in existence may well have short-term advantages both for some shippers and some roads, the Commission could quite reasonably conclude that it has long-term drawbacks as well. The otherwise adverse effect on a road's ability to serve shippers that would result from its owning too few cars is cushioned; the beneficial effect on a road's ability to serve shippers that would result from its owning a sufficient supply of cars is dissipated. The Commission undoubtedly felt that rules designed only to most efficiently utilize the existing inadequate fleet of freight cars would have little or no effect on the nationwide shortage of such cars. Indeed, the appellees stress the concession by the Commission that these rules "are not designed to improve the utilization of freight cars, except insofar as return loading is compatible with the primary objective of increasing availability of cars to the owner." 335 I. C. C., at 294.

But only if we were to hold that Congress, in enact-

ing the Esch Car Service Act, intended that the only criterion that the Commission might consider in establishing "reasonable rules, regulations, and practices with respect to car service" was the optimum utilization of an existing fleet of freight cars, however numerically inadequate that fleet might be, could this argument be sustained. Neither the language that Congress used nor the legislative history of the Act supports such a narrow reading of its grant of authority to the Commission. On the record before it, the Commission was justified in deciding that the railroads and the shippers were afflicted with an economic illness that might have to get worse before it got better. Existing practices respecting car service tended to destroy any incentive on the part of railroads to acquire new cars, and the resulting failure to acquire new equipment contributed to an overall nationwide shortage of freight cars that prevented the railroad industry from adequately serving shippers. Car-service rules that would tend to restore incentive to the various roads to augment their supply of freight cars, even at the temporary expense of optimum utilization of the existing fleet of freight cars, conform under these circumstances to the statutory requirement of reasonableness.

Appellees support their claim that the Commission's promulgation of these rules is not "reasonable" under the Esch Act on two grounds not directly related to the rules' claimed adverse effect on the ability of the roads to serve shippers. They attack the absence of a Commission finding as to the financial ability of roads inadequately supplied with freight cars to purchase new ones, and they cite the conceded impossibility of obtaining complete compliance with the rules as additional evidence of their unreasonableness.

The Commission's order does not require any road to purchase any freight cars. It abridges to some extent

the existing practice among railroads of treating the freight cars that they own as a pool, and for that reason may ultimately cause roads that do not have an adequate supply of freight cars to serve on-line shippers to be less able to serve such shippers than they are now. If, as a result of this fact, such roads are placed under economic and competitive pressure to acquire additional freight cars, there is certainly no principle of law we know of that would require the Commission to permit them to avoid this economic pressure by continuing to borrow freight cars acquired and owned by other lines.

The Commission, acceding to the arguments of shippers and railroads on rehearing, agreed that mandatory total compliance with the rules promulgated would be impossible in view of the tremendous number of units involved, and, accordingly a procedure by which exceptions might be applied for was established. How the provision for exceptions will be administered in practice is a matter about which we could only speculate at present. It is well established that an agency's authority to proceed in a complex area such as car-service regulation by means of rules of general application entails a concomitant authority to provide exemption procedures in order to allow for special circumstances. *Permian Basin Area Rate Cases,* 390 U. S. 747, 784–786 (1968). What bearing any of these factors might have on an action under the provisions of 49 U. S. C. § 1 (17) for the collection of penalties for a violation of the rules in question is a question best decided in such a proceeding. The fact that violation of a rule promulgated under the Esch Car Service Act may be the basis for a proceeding to collect a penalty does not either expand or contract the statutory definition of "reasonable" found in that Act.

What we have said thus far is enough to indicate our view that there is sufficient relationship between the

Commission's conclusions and the factual bases in the record upon which it relied to substantively support this exercise of its authority under the Esch Act. Appellees press on us an additional claim that the Commission failed to comply with the provisions of the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.,* citing *Burlington Truck Lines* v. *United States,* 371 U. S. 156 (1962), and *Secretary of Agriculture* v. *United States,* 347 U. S. 645 (1954). *Burlington Truck Lines* is clearly inapposite, however, since in that case the Court was dealing with adjudication, not rulemaking. In criticizing the Commission's action there, the Court said that "the Administrative Procedure Act will not permit us to accept such adjudicatory practice," 371 U. S., at 167. In *Secretary of Agriculture* v. *United States, supra,* the Court reviewed the Commission's action, not under the Administrative Procedure Act, but on the basis of its prior cases establishing the standard for judicial review of agency action. Commenting that "[i]n dealing with technical and complex matters like these, the Commission must necessarily have wide discretion in formulating appropriate solutions," the Court went on to conclude that the Commission "has not adequately explained its departure from prior norms and has not sufficiently spelled out the legal basis of its decision." 347 U. S., at 652–653. For the reasons previously stated, we find no such infirmities here.

This Court has held that the Administrative Procedure Act applies to proceedings before the Interstate Commerce Commission. *Minneapolis & St. Louis R. Co.* v. *United States,* 361 U. S. 173, 192 (1959). Appellees claim that the Commission's procedure here departed from the provisions of 5 U. S. C. §§ 556 and 557 of the Act. Those sections, however, govern a rulemaking proceeding only when 5 U. S. C. § 553 so requires. The latter section, dealing generally with rulemaking,

makes applicable the provisions of §§ 556 and 557 only "[w]hen rules are required by statute to be made on the record after opportunity for an agency hearing . . . ." The Esch Act, authorizing the Commission "after hearing, on a complaint or upon its own initiative without complaint, [to] establish reasonable rules, regulations, and practices with respect to car service . . . ," 49 U. S. C. § 1 (14)(a), does not require that such rules "be made on the record." 5 U. S. C. § 553. That distinction is determinative for this case. "A good deal of significance lies in the fact that some statutes do expressly require determinations on the record." 2 K. Davis, Administrative Law Treatise § 13.08, p. 225 (1958). Sections 556 and 557 need be applied "only where the agency statute, in addition to providing a hearing, prescribes explicitly that it be 'on the record.' " *Siegel* v. *Atomic Energy Comm'n,* 130 U. S. App. D. C. 307, 314, 400 F. 2d 778, 785 (1968); *Joseph E. Seagram & Sons Inc.* v. *Dillon,* 120 U. S. App. D. C. 112, 115 n. 9, 344 F. 2d 497, 500 n. 9 (1965). Cf. *First National Bank* v. *First Federal Savings & Loan Assn.,* 96 U. S. App. D. C. 194, 225 F. 2d 33 (1955). We do not suggest that only the precise words "on the record" in the applicable statute will suffice to make §§ 556 and 557 applicable to rulemaking proceedings, but we do hold that the language of the Esch Car Service Act is insufficient to invoke these sections.

Because the proceedings under review were an exercise of legislative rulemaking power rather than adjudicatory hearings as in *Wong Yang Sung* v. *McGrath,* 339 U. S. 33 (1950), and *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292 (1937), and because 49 U. S. C. § 1 (14)(a) does not require a determination "on the record," the provisions of 5 U. S. C. §§ 556 and 557 were inapplicable.

This proceeding, therefore, was governed by the provisions of 5 U. S. C. § 553 of the Administrative Procedure Act, requiring basically that notice of proposed rulemaking shall be published in the Federal Register, that after notice the agency give interested persons an opportunity to participate in the rulemaking through appropriate submissions, and that after consideration of the record so made the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.[5] The "Findings" and "Conclusions" embodied in the Commission's report fully comply with these requirements, and nothing more was required by the Administrative Procedure Act.

We conclude that the Commission's action in promulgating these rules was substantively authorized by the Esch Act and procedurally acceptable under the Administrative Procedure Act. The judgment of the District Court must therefore be

*Reversed.*

---

[5] 49 U. S. C. § 1 (14) (a) likewise requires the Commission to conduct a hearing before promulgating rules.