**ANN ARBOR RAILROAD COM-
PANY et al.**

v.

**UNITED STATES of America and Interstate Commerce Commission.**

**Civ. A. No. 73–881.**

United States District Court,
E. D. Pennsylvania.

April 30, 1973.

John A. Daily, Philadelphia, Pa., for plaintiffs.

Theodore C. Knappen, Interstate Commerce Commission, Washington, D. C., for defendants.

## MEMORANDUM

HANNUM, District Judge.

Plaintiff railroads commenced this proceeding pursuant to 28 U.S.C. §§ 2321–2325 to suspend, enjoin, annul and set aside an order of the Interstate Commerce Commission. Jurisdiction is conferred upon the Court by 28 U.S.C. § 1336(a). Presently before the Court is plaintiffs' Motion for Temporary Restraining Order pursuant to 28 U.S.C. § 2284(3) pending adjudication of the merits by a three-judge court.

In an attempt to alleviate the problem of freight car shortages, the Commission, acting pursuant to its rule making authority embodied in Section 1(14)(a) of the Interstate Commerce Act, 49 U.S.C. § 1(14)(a), as amended in 1966, issued a report and order entitled "Incentive Per Diem Charges—1968"[1] in April 1970. This rule required that during the six month period from September 1 through February 28, a railroad using an unequipped boxcar owned by another railroad was required to pay the owning railroad ("Creditor railroad") a fixed compensation for the use of the car. In its initial opinion of April 28, 1970, the Commission stated that it considered the case as an "open-end" proceeding and that the proceeding would be reopened after some experience had been gained so that appropriate modifications and reservations could be made. See 337 I.C.C. 217 at 219, 220. Since the rule was promulgated, several railroads have filed petitions seeking reopening of the proceedings and modification and/or recission of the rule. A subcommittee of the House of Representatives convened in September 1972 was highly critical of the rule.[2]

By order dated and served March 6, 1973, the Commission promulgated a proposal to extend the existing incentive

---

[1] 337 I.C.C. 217 (1970).

[2] *See*, H.R.Rep.No.92–1384, 92nd Cong., 2nd Sess. (1972).

per diem charges on plain, unequipped boxcars from the existing six month period to a permanent year-round basis. The order invited responses, which were to be filed on or before March 23, 1973. On March 30, 1973 the Commission issued the order herein complained of, amending its order of April 28, 1970, so as to indefinitely extend incentive per diem regulations and charges to a year-round basis. Under this order, the railroads were ordered to resume incentive per diem payments on May 1, 1973. The basis for the Commission's regulation, as stated in the notice of March 6, 1973, its order of March 10, 1973, and at a hearing before this Court on April 26, 1973, is that the nation is facing an increasingly critical boxcar shortage caused primarily by the unprecedented demand for movement of grain brought about by the Russian wheat sale agreement. The Commission conceeds that despite the existence of funds generated by the incentive per diem rule of April 1970 and earmarked for the purchase, building, or rebuilding of unequipped cars, the railroads during the last four years have retired more than three times as many boxcars as they have installed or rebuilt. The Commission also conceeds that over 21 million dollars generated under incentive per diem remain to be disbursed. The Commission argues, however, that incentive per diem is the only means presently available to alleviate the present crises. The affidavit of William T. Bono, Chief, section of cost and valuation, bureau of accounts, Interstate Commerce Commission states that over 15 million dollars of funds generated under incentive per diem since its inception have been expended and with these funds a total of 3,478 boxcars have been purchased.[3]

Plaintiffs, in their attack upon the Commission's order of March 30, 1973, allege (1) that the Commission failed to afford them an opportunity to participate in the rule making proceedings as required by Section 553 of the Administrative Procedure Act and Section 1(14)(a) of the Interstate Commerce Act; (2) that under the circumstances the Commission's order of March 30, 1973 is arbitrary and capricious and; (3) that the Commission's refusal to act on the various petitions for reconsideration is "unlawfully withheld or unreasonably delayed" within the meaning of 5 U.S.C. § 706(1).

Section 2284(3), 28 U.S.C. provides that ". . . the district judge to whom the application is made may, at any time, grant a temporary restraining order to prevent irreparable damage." In determining whether to grant the requested temporary relief the Court will take four factors into consideration: (1) Plaintiffs' showing that without such relief they will be irreparably injured; (2) the public interest; (3) possible harm to other interested parties and (4) plaintiffs' likelihood of success on the merits. See, Middlewest Motor Freight Bureau v. United States, 433 F.2d 212, 240 (8th Cir. 1970); Palmigiano v. Travisono, 317 F.Supp. 776, 787 (D.R.I.1970); Virginia Petroleum Jobbers Association v. United States, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

It has been made to appear by the affidavits which were presented to the Court that unless the Commission's order of March 30, 1973 is restrained, irreparable damage will befall the plaintiffs in that:

1. Reading Company, already in reorganization, would have its present incentive per diem cash payout doubled to approximately $1 million per year. This cash will thus be unavailable for vital daily operating expenses. (Affidavit of Frederick J. May, p. 3.)

2. Lehigh Valley, which has already filed a petition with the Reorganization Court for authority to cease all operations October 1, 1973, would be obligated

---

3. Appendix B to the Commission's notice of March 6, 1973 states that 332,927 plain boxcars were owned in the United States on January 1, 1973 (Class I Railroads).

to pay out an additional $900,000 a year from its existing resources, whereas lack of cash has already forced Lehigh Valley to defer repairs to its own "bad order" fleet. This additional cash drain would have a devastating effect on Lehigh Valley, which over the past six years has sustained net losses ranging from $3.7 to $17.6 million annually. (Affidavit of Robert C. Haldeman, pp. 1–2).

3. The order of March 30 will compel Penn Central to pay out $1.1 million in cash for the months of May, June, July and August. Penn Central has already advised the Reorganization Court that a cash crisis will develop in July-September, 1973, which could force a cessation of operations. An additional cash drain in excess of $1 million per month would only aggravate the very real threat to Penn Central's continued service. (Affidavit of Jervis Langdon, Jr., pp. 3–7; Affidavit of Andrew C. Weamer, pp. 2–3; Affidavit of Ernest R. Varalli, p. 2.)

4. Erie Lackawanna would be obligated under the Commission's order of March 30 to pay out approximately $600,000 for the four months May through August, 1973, which funds will not be available for the repair of its own cars. Over 1,000 of Erie's general service boxcars are out of service at the present time, and if Erie is deprived of these funds its "bad order" ratio and consequent inability to adequately serve the public will be seriously aggravated. (Affidavit of J. R. Neikirk, pp. 2–3, 5.)

5. Delaware and Hudson has already been compelled to bring its work force to the irreducible minimum. Under the Commission's order, D&H will be obligated to pay out in incentive per diem an additional $27,100 per month over the next four months. This will only precipitate further deferral of maintenance, deferral of freight car repairs, employee layoffs and the inevitable decline of service to the shipping public. (Affidavit of Thomas W. Eagan, pp. 1–3.)

6. The Commission's order of March 30 will compel Rock Island to pay out an additional $830,000 annually. Rock Island's cash reached a low in March of only $2.1 million. Because of lack of present resources, Rock Island has already deferred track maintenance, reduced its work force, and eliminated repairs to equipment. Five of Rock Island's branch lines are inoperable for service to the shipping public because Rock Island presently has insufficient cash to maintain these properties in safe and serviceable condition. The only result of additional incentive per diem payments will be a reduced level of service to the shipping public and consequent loss of revenue. (Affidavit of William J. Dixon, pp. 2 through 4, and attached Verified Statement.)

7. Soo Line has already paid out $880,000 in the past 18 months of incentive per diem experience. Soo Line's capacity in terms of additional equipment, such as jumbo covered hoppers, would be greater today had it not been for the $880,000 already drained from its resources. Incentive per diem has in fact contributed in a substantial way to a reduction in the national fleet of plain boxcars. (Affidavit of Thomas R. Klingel, pp. 2, 7.)

8. For the next four months, May 1 through August 31, 1973, the Commission's order will cost Chesapeake and Ohio and Baltimore and Ohio a total of $872,000. C&O/B&O is now doing its level best to provide service, even to the extent of moving grain in open-top coal cars and dumping it into vessels at a North Atlantic Port over a coal dumping Pier. There is no way in which these increased incentive per diem penalties can result in more efficient use of existing equipment. (Affidavit of Charles M. Slavin, pp. 2–3.)

The defendants' opposition to the present motion stresses that the Commission's action in extending incentive per diem is in the public interest since its purpose and effect will be to aid in alleviating the immediate emergency confronting the nation. In the Court's view, however, there is no evidence that the Commission's order of

March 30, 1973 will have any immediate positive effect. There is no requirement or indication that the incentive per diem funds which will be received by "creditor railroads" pursuant to the Commission's order of March 30, 1973 will be expended for the prescribed purposes in the immediate future. Moreover, the affidavits submitted by the plaintiffs, showing their desperate need to avoid an additional cash drain to maintain continued service, are persuasive that immediate implementation of the Commission's order would adversely affect the public interest.[4]

Turning briefly to the question of possible harm to other interested parties, there has been no showing that the issuance of a temporary restraining order would have a serious adverse affect on other interested parties such as the "creditor railroads".

Defendants argue that plaintiffs have failed to show a likelihood of success on the merits. Citing United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), which sets forth the standard of judicial review of rule making proceedings of the Commission, the defendants emphasize that, at the very least, the extension of incentive per diem has a rational basis. Without prejudice to a contrary showing at the time this case is heard on the merits, there is a substantial doubt that the conclusions reached by the Commission in support of its extension order of March 30, 1973 are rationally supported. The Court's view is influenced by the present affidavits and by the Report of the Special Subcommittee on Investigations of the Committee on Interstate and Foreign Commerce, House of Representatives; Inquiry Into Freight Car Shortages, House Report No. 92-1384, 92nd Congress, 2d Session (1972), which states at page 20:

"In sum, incentive per diem as presently structured is not working. It is neither an effective incentive to return cars nor to buy new ones. The I.C.C. should give immediate consideration to restructuring the incentive factor."

Plaintiffs also challenged the order of March 30, 1973 on procedural grounds. The Commission's proceeding was governed by Section 1(14)(a) of the Interstate Commerce Act and Section 553 of the Administrative Procedure Act.[5] While it is now clear that the "hearing" requirement of these statutes does not demand that the Commission hear oral testimony and permit cross-examination,[6] the Commission is still obligated to afford fair notice of exactly what the Commission intends to do and a reasonable opportunity for interested parties to know the views of opposing parties so that all interested parties have a fair opportunity to participate in the rule making process. These procedural requirements enable the agency promulgating the rule "to educate itself before establishing rules and procedures which have a substantial impact on those regulated." Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir. 1969). Upon the present state of the record the Court concludes that plaintiffs have also shown a probability of success on their procedural argument.

4. By order of April 25, 1973, the Commission reopened the proceeding for several purposes including to determine whether a specified period should be prescribed within which incentive funds must be expended and to determine whether the Commission should, in the public interest, exempt certain bankrupt carrriers. The Commission, however, did not postpone the effective date of the order herein complained of.

5. See, United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U. S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

6. See, United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

Under the facts of this case, the balance tips decidedly in plaintiffs' favor and a temporary restraining order will be granted.