SOUTHERN RAILWAY COMPANY
et al., Plaintiffs,

v.

The UNITED STATES of America and
The Interstate Commerce
Commission, Defendants,

and

Pacific Fruit Express Company,
Intervening Defendant.

Civ. A. No. 1776–73.

United States District Court,
District of Columbia.

Oct. 23, 1980.

**976**

Charles Lettow, Robert Glicksman, Washington, D. C., Edward Kaier, Philadelphia, Pa., for plaintiffs.

Marc J. Sonnenfeld, William J. Taylor, Philadelphia, Pa., H. Glenn Scammel, I.C.C., David MacDonald, John Guandolo, Washington, D. C., for defendants.

Before WALD, Circuit Judge, and JUNE L. GREEN and OBERDORFER, District Judges.

## MEMORANDUM

Section 11105 of the Transportation Act, 49 U.S.C. § 11105,[1] gives the Interstate Commerce Commission authority to regulate rates carriers must pay to persons furnishing protective services against heat or cold for rail cars transporting spoilable goods. In 1976, this court held that the Commission had the power to regulate protective service rates prospectively. It remanded to the Commission for further consideration the question of whether railroads could or should be held responsible for previous noncompliance with its protective service rate orders, retaining jurisdiction in order to consider this issue in light of the Commission's conclusions. In response, the Commission ruled the railroads were liable to pay protective service rates ordered by the Commission retroactively.

### I. Background

The lengthy and complex history of this case is set out in detail in the court's earlier opinion. *See Southern Ry. Co. v. United States*, 412 F.Supp. 1122, 1127–34 (D.D.C. 1976). We summarize this history only briefly, adding an account of the events which have occurred since the remand to the Commission.

Since 1953, "mechanical protective services" (MPS) against heat and cold have been available for use in the rail transportation of perishables. Since one car line, or other MPS supplier, is alone responsible for the supply and operation of MPS units, thus potentially bearing the entire cost of the

---

1. Section 11105 states in pertinent part:

   A rail or express carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may arrange for a person to furnish to or for the carrier a protective service against heat or cold for property transported by it subject to that jurisdiction only when the Commission finds the arrangement to be reasonable and in the public interest."
   49 U.S.C. § 11105.
   This provision replaces 49 U.S.C. § 1(14)(b).

protective service, problems developed in setting rates to govern the use of such specially equipped rail cars over more than one railroad. The industry responded privately to this problem by developing a system, known as "Division Sheet 7," for allocating protective service revenues. In 1962, however, after extensive hearings, the Commission concluded that this system of allocation did not adequately compensate MPS suppliers for their expenses. The Commission therefore promulgated its 1962 Report and Order, *Contracts for Protective Services*, 318 I.C.C. 111 (1962) ("1962 Order"). In this order, the Commission approved, for a limited period of time, certain MPS contracts, but only on the conditions (1) that carriers already receiving protective services submit new and superseding contracts covering these services for approval by the Commission and (2) that any new and superseding contracts contain, among other things, a guarantee that such contracts compensate MPS suppliers for costs plus reasonable profit for the service they provided. 318 I.C.C. at 125–127.

This order greatly confused the industry. Although one railroad petitioned for clarification and/or modification of the order, the Commission denied the petition. After the order became effective, on June 10, 1963, the Commission added to the confusion over its meaning by conditionally approving contracts submitted to it as being in compliance with the 1962 Order, including contracts that continued to use the apparently invalidated Division Sheet 7 and that failed to reimburse MPS suppliers for costs and reasonable profit.

In 1965, Pacific Fruit Express Company ("PFE"), a company that provides MPS, brought an action in the Northern District of California against certain railroads for injunctive relief and to recover cost plus profit compensation for furnishing MPS units. That district court certified certain questions to the I.C.C. In response, in 1972, the I.C.C. provided the court with its conclusions in *Contracts-Protective Service Be-*tween Pacific Fruit Express Company and the Akron, Canton & Youngstown R. R. Co., et al., 340 I.C.C. 754 (1972) ("the 1972 Order"). It declared that: (1) PFE's furnishing of a MPS unit constituted "protective service" within section 11105; (2) the 1962 Order required the filing of contracts between PFE and non-originating carriers; and (3) Division Sheet 7 was "specifically embraced" by the 1962 Order, and the failure to file contracts superseding it therefore violated section 11105. 340 I.C.C. at 754, 766–71. Consequently, the court held that the defendant railroads had violated the 1962 Order and section 11105 by failing to enter new contracts superseding Division Sheet 7, and that this violation gave plaintiffs a right of action for damages and injunctive relief. *Pacific Fruit Express Co. v. Akron, Canton & Youngstown R. R. Co.*, 355 F.Supp. 700, 707 (N.D.Calif.1973), aff'd. 524 F.2d 1025 (9th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976).

Thereafter, plaintiff railroads brought this suit against the Commission, seeking to set aside its 1962 Order on the grounds, *inter alia*, that it was vague and lacked statutory authorization. PFE intervened as defendant in the suit. The court declined to set aside the 1962 Order, and further held that the 1962 Order, together with section 11105, authorized the Commission's 1972 Order and prospective application of it. The court was reluctant, however, to give retroactive effect to the 1972 Order which would expose the railroads to liability for past noncompliance with the 1962 Order. This reluctance about giving retroactive effect to the order derived, first, from equitable concerns. The court noted the vagueness of the 1962 Order, and the Commission's refusal to clarify it, as well as the I.C.C.'s approval of Division Sheet 7 contracts despite their apparent violation of the 1962 Order. Second, this reluctance derived from concern whether retroactive enforcement of the order would be barred by section 10705[2] of the Transportation

---

2. Section 10705 states in pertinent part:
   The Commission shall prescribe the division of joint rates to be received by a carrier providing transportation subject to its jurisdiction ... when it decides that a division of joint rates established by the participating

Act, 49 U.S.C. § 10705, since the Supreme Court has interpreted that provision as prohibiting the I.C.C. from requiring readjustments of past divisions, or shares of the total revenue produced by a rail shipment, that have privately been agreed to by carriers. *Brimstone R. and Canal Co. v. United States*, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928) ("*Brimstone*"). This concern was aggravated by the fact that this circuit has extended the *Brimstone* doctrine by holding that section 10705 bars courts, as well as the Commission, from equitably adjusting past agreements on divisions. *B & O R. Co. v. Alabama Great Southern R. Co.*, 506 F.2d 1265 (D.C.Cir.1974) ("*B & O*"). This court recognized that the doctrine established in *Brimstone* did not necessarily govern the issue in the instant case because *Brimstone*, and section 10705, concern agreements on divisions between carriers, rather than specific compensation for protective services paid by carriers to MPS suppliers. Nevertheless, the court was concerned that section 10705 may bar an award of damages for past noncompliance with section 11105, since alteration of previous MPS contracts could indirectly affect division agreements by altering the expectations carriers had as to past receipts. In light of these reservations, the court remanded the issue of retroactive liability for noncompliance with the 1962 Order to the I.C.C. for further consideration, stating:

> If it is the Commission's understanding that plaintiff carriers are liable for their previous non-compliance, then we will have to decide whether, and if so to what extent, considerations of equity or the *Brimstone* decision bar such liability.

412 F.Supp. at 1147.

The I.C.C. issued its response to the court's order, *Contracts for Protective Services*, 358 I.C.C. 638 (1978), on July 27, 1978. The Commission noted that various settlement conferences between interested carriers and car lines had been held, pursuant to a directive from the court, and that, as a result, all the railroads and car lines affected by the issue had settled. The Commission went on to answer the question of the propriety of imposing retroactive liability that was raised not only by this court but also by the United States District Court for the Eastern District of Pennsylvania, in *Atchison, Topeka, & Santa Fe Ry. Co. v. Baltimore & Ohio R. Co.*, Civil Action No. 74–1859 (E.D.Pa., filed July 22, 1974). In that case, the Atchison, Topeka, and Santa Fe Railway Company ("Santa Fe"), a carrier which also provides protective services, sued the railroads, who are plaintiffs in this action, for their alleged failure to compensate for costs incurred, plus a reasonable profit, for MPS provided since 1963.[3] The Commission concluded that neither the lack of further administrative action, nor equitable considerations, nor the prohibitions of section 10705 barred retroactive liability under section 11105. It also concluded that no further administrative action was required before a private cause of action arose.

On August 25, 1978, twenty one railroads petitioned the Commission to reconsider its July 27 Order in light of changed circumstances brought about by the settlements which had been reached between railroads and the major car lines. Specifically, the railroads argued that because Santa Fe was, after these settlements, the only remaining party suing the railroads for MPS damages, the Commission should reassess its July 27 Order because that order did not focus on the specific facts of Santa Fe's operations. The Commission declined to do so. *Contracts for Protective Services*, decided January 9, 1979.

Subsequently, the railroad plaintiffs in this case moved the court for leave to name Santa Fe as an additional defendant.

---

carriers . . . or under a decision of the Commission . . . does or will violate section 10701 of this title [the section establishing standards for rates].

49 U.S.C. § 10705(b)
This provision replaces 49 U.S.C. § 15(6).

**3.** On July 24, 1979, the Court stayed further proceedings in that case, pending the outcome of the instant litigation.

Plaintiffs also moved the court for leave to file a supplemental complaint, alleging that the I.C.C.'s July 27 Order was arbitrary, exceeded the statutory authority of the Commission, and failed to address the specific issues raised by Santa Fe's identity as both a carrier and a supplier of MPS. The Court granted both these motions.[4]

Plaintiffs and defendants have filed cross motions for summary judgment on the issue of retroactive liability. Since this dispute focusses on the validity of the Commission's 1978 and 1979 orders authorizing the imposition of retroactive liability, no material facts are in dispute and the Court will rule on the parties' motions. For reasons more fully stated below, we affirm the order.

## II. Scope of Review

■ In the earlier opinion, Judge Leventhal, writing for this court, specifically and clearly indicated an intention to give deferential weight to the expertise of the Commission and the conclusions it reached on the remanded issues. The court emphasized that the Commission has primary jurisdiction to delineate national transportation policy. It stated that:

> [t]he Commission's analysis of the intendment and consquences of its order, if not clearly erroneous, must be given weight by the court.

412 F.Supp. at 1151.

Indeed, the court indicated that deference to the Commission's conclusions on the issue of retroactive liability would be particularly appropriate because such liability for past non-compliance

> "not only implicates a possible statutory barrier ... but also may have impact on the present solvency of the carriers, triggering the very concerns that led Congress to establish the ICC."

*Id.* It was emphasized that courts have no monopoly on the capacity to deal with equitable considerations such as might control the retroactivity issue here.

This posture of deference is not only suggested by our earlier opinion but is also confirmed by the Administrative Procedure Act and the pertinent case law. Since 49 U.S.C. § 11105, under which the orders in question were promulgated, does not specifically provide for any agency hearing on the record as a prerequisite to reaching a decision, the 1962, 1972 and 1978 Orders fall within the category of informal rulemaking. *See* 5 U.S.C. § 553; *e. g., United States v. Allegheny-Ludlum Steel,* 406 U.S. 742, 756–57, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972). 5 U.S.C. § 706 of the APA in turn dictates the appropriate, and limited, standard of review for informal rulemaking, directing that the court set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Thus, this Court should uphold the agency action as long as a rational basis exists for its decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C.Cir.1976) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). As the Supreme Court has stated, specifically delineating the proper scope of judicial review of I.C.C. actions,

> We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported."

*United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946–1947, 32 L.Ed.2d 453 (1972).

■ Such a deferential posture is particularly appropriate where, as in this case, purely economic rather than constitutionally protected interests are at stake. As the Court of Appeals of this circuit has stated,

> fundamental personal interests in life, health and liberty ... have always had a special claim to judicial protection, in comparison with the economic interests at stake in a ratemaking or licensing proceeding.

4. Order dated April 3, 1979.

*Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 598 (D.C.Cir.1971); *see also* Wright, "Judicial Review and the Equal Protection Clause," 15 *Harvard Civil Rights-Civil Liberties L.Rev.* 1, 6 (1980).

With these limitations on the appropriate level of review in mind, we turn to a consideration of each of the plaintiffs' challenges to the I.C.C.'s order.

### III. The 1978 Order

#### A. Further Administrative Action

■ Plaintiffs challenge the Commission's conclusion in its 1978 Order that no further administrative action is required before liability could arise pursuant to a private cause of action for the failure to file superseding contracts. They assert that the 1962 Order explicitly contemplated further administrative action because it stated that "[i]n the event new or superseding contracts are not filed, further consideration will be given to the issuance of an order finding the presently unapproved contracts not within the requirements of [section 11105]." 318 I.C.C. at 127. They point, moreover, to language in the Commission's 1972 Order which stated that liability would arise "from the contracts required by the Commission's order or by other means." 340 I.C.C. at 769. They argue that the phrase "other means" must refer to further administrative action.

However, the Commission explained in its 1978 Order that it does not interpret the 1962 and 1972 Orders as requiring further administrative action. The Commission read the language in the 1972 Order cited by plaintiffs as referring to the fact that "the Order itself does not constitute a contract between the parties." 340 I.C.C. at 769. Therefore, it explained, the language was merely intended to establish that an action "could not be brought using the Commission's 1962 Order as a contract between the parties, [but] it must instead be based on any contracts which the parties may have entered into or 'by other means,'" 358 I.C.C. at 644, *i. e.*, by actions

seeking injunctive relief or damages under 49 U.S.C. § 11705 (formerly sections 8, 9, and 16(2) of the Act), which delineates the rights and remedies of persons injured by carriers.[5]

The Commission further explained that the language in the 1962 Order cited by plaintiffs does not require administrative action as a prerequisite of private enforcement actions, but instead merely suggests the possibility of considering such further action. As the Commission noted, "the fact that more aggressive action was not taken should not be deemed to render that order ineffective." 358 I.C.C. at 644.

It is clear that the Commission's interpretation of its own orders must be accorded particularly great deference. Thus the Court of Appeals of this Circuit has recently stated:

> [w]hen construction of an agency regulation is in issue, courts owe great deference to the interpretation adopted by the agency and will uphold that interpretation if it is reasonable and consistent with the regulation. The court need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance.

*Belco Petroleum Corp. v. Federal Energy Regulatory Commission*, 589 F.2d 680, 685 (D.C.Cir.1978). In light of this posture of review, and the reasoned basis for the Commission's interpretation, we defer to the Commission's conclusion that further administrative action is not required here.

#### B. Equitable Considerations

■ Plaintiffs claim that liability for past noncompliance with the 1962 Order is also barred by equitable considerations. They argue, first, that such liability is precluded on the basis of the equitable considerations raised in *Moss v. C.A.B.*, 521 F.2d 298 (D.C.Cir.1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976),

---

**5.** This interpretation was adopted by the Court of Appeals for the Ninth Circuit in *Pacific Fruit Express Co. v. Akron C. & Y. R. Co.*, 524 F.2d 1025, 1030 (9th Cir. 1975), *cert. denied* 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976).

*reh. denied* 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 211 (1979). In that case, the Court denied retroactive liability, relying in part on two equitable factors: first, it argued that retroactive liability was inappropriate where there existed no "fund of net enrichment from which restitution could appropriately be made." 521 F.2d at 314. Second, it concluded that retroactive liability may be barred where there is no willful violation of the relevant statutory provision. Plaintiffs argue, accordingly, that retroactive liability is inappropriate in this case because plaintiffs carried on protective service operations at a loss, so that there was no net enrichment from which restitution could be made. They further argue that because the Commission did not make absolutely clear the scope of its 1962 Order, and because the Commission refused upon petition to clarify its order, the railroads' failure to cooperate may not be considered willful and therefore may not equitably give rise to retroactive liability.

The Commission's 1978 Order squarely dealt with the impact of the equitable considerations raised in the *Moss* decision. It concluded that plaintiffs' reliance on the two tests raised in that case is misplaced. Most importantly, as the Commission pointed out, and as plaintiffs themselves conceded,[6] *Moss* did not establish controlling law for this case because there was no statutory basis for plaintiff's cause of action in that case; instead, the cause of action was based purely on an equitable theory of restitution. In this case, by contrast, the cause of action derives from a specific statutory provision. 358 I.C.C. at 650–51. Indeed, while this court did cite the *Moss* decision in the earlier opinion, 412 F.Supp. at 1151, that decision served only an illustrative purpose, providing merely an example of a case where equitable considerations were carefully balanced and taken into account.

Plaintiffs also argue that retroactive liability is barred by other equitable considerations raised by the specific facts of this case. They claim, first, that Santa Fe delayed demanding enforcement of its rights, second that Santa Fe failed to keep separate accounts for all aspects of its MPS operations, thus precluding the possibility of accurately tallying its past profits, and third that Santa Fe claimed damages only because it sought to make other companies cover losses for its own mistake in equipping too many cars with MPS units.

The Commission did not, however, fail to take the equitable considerations raised by the specific facts of the situation into account in concluding that the equities favored the MPS suppliers. It reached this conclusion with respect to the positions both of the car lines and of Santa Fe. It noted, *inter alia*, that the railroads had refused to reimburse the car lines for the costs they had incurred, forcing the car lines to incur ever-increasing deficits, while at the same time they sought to justify their applications for increases in railroad MPS tariff charges by submitting evidence of the unanticipated expenses for car line company MPS service. 358 I.C.C. at 652.

While there is always room for argument as to where equities ultimately lie, the Court cannot say that the Commission abused its discretion in reaching the conclusion that it did. As this court stated in its earlier opinion,

> "the principles underlying primary jurisdiction would seem to require that weight be given to the Commission's views on the equity of restitution for the benefit of foreign car lines .... This involves awareness of the extent of injustice to one side or the other, and the relative weight, so to speak, of the injustices and burdens."

412 F.Supp. at 1151 & n. 88. Thus, deference to the Commission's conclusions is especially appropriate since

> [t]he equitable aspects of refunding past rates are inextricably entwined with the [Commission's] normal regulatory responsibility, as such refunds may substantially

6. Plaintiffs admit that *Moss* "is not applicable here as ineluctably binding law, but rather provides an instructive example of a similar situation where equitable considerations were carefully examined and explained." Plaintiff's Brief at 32.

affect the future rates, performance, and health of the industry.

*Id.* at 1151, *quoting Moss v. C.A.B.*, 521 F.2d at 308–09.

An earlier clarification by the Commission of the 1962 Order would obviously have been more appropriate. The Commission itself so states in the 1978 Order. 358 I.C.C. at 651. Had it more clearly expressed its intent, or had it agreed to clarify its position from the beginning, a great deal of confusion and of costly litigation might have been spared. This delay does not, however, justify court disapproval of the I.C.C. decision here. Although, the 1962 Order could well have been clearer in its intent, it was sufficient to put plaintiffs on notice that Division Sheet 7 contracts were to be superseded by fully compensatory contracts. The 1962 Order did state that

> it is desirable that the charge for each protective service be sufficient to cover the costs of rendering that service. This also applies to services performed under Division Sheet 7.

318 I.C.C. at 125–26. It makes clear that Division Sheet 7 is an inadequate standard, in the Commission's view, for compensating MPS suppliers. Thus, even if unwise, the Commission's delay does not reach the level of arbitrary or capricious behavior which would justify such disapproval.

### C. The Brimstone Doctrine

■ Plaintiffs challenge the Commission's conclusion that the doctrine established in *Brimstone* does not bar liability for previous noncompliance with the 1962 Order. As plaintiffs point out, the Commission justified this conclusion in part on the grounds that the *Brimstone* doctrine applied only to contracts between railroads and did not preclude retroactive liability for transactions between railroads and car lines or other MPS suppliers. According to plaintiffs, such reasoning ignores reality because the car lines are merely subsidiaries of larger carrier parents and because, in particular, Santa Fe, in its capacity as a MPS supplier, is not even a separate entity from Santa Fe in its capacity as a railroad.

The Commission was aware both of the "affinity" between the car lines and their parent carriers, *see* 358 I.C.C. at 646, and, as it stated in its denial of the petition for reconsideration, of the dual capacity of Santa Fe as both carrier and supplier of MPS. Nevertheless, it found these situations distinguishable from *Brimstone* and the restrictions of section 10705 because, in its view, the provisions of section 11105 provide specific authority, separate from section 10705, for awarding compensation to suppliers of MPS, irrespective of their carrier affiliation.

In addition, and more persuasively, the Commission pointed to the fact that *Brimstone* involved only the propriety of the readjustment of previously agreed upon divisions, which are materially different from provision for payment by a railroad of the cost plus profit for MPS service. 358 I.C.C. at 647. A division is, as indicated,[7] a percentage of the total revenue, or joint rate, derived from a specific transportation of goods. It may, as in this case, be negotiated and established by voluntary agreements among private parties involved in the shipment. *See* Hamilton, "Divisions of Joint Rail Freight Rates Under the Interstate Commerce Act," 37 *I.C.C. Practitioners' Journal*, 378, 379–85 (1969). As with any private negotiation, the division finally agreed on is typically the product of many factors. A railroad may, for example, be willing to accept a low, noncompensatory joint rate in exchange for receiving a large division. As a result, a particular carrier may have specific expectations as to what it will receive in exchange for concessions it has made. Retroactive revision of a division might well destroy the basis on which such an agreement was made. This concern was apparent in the *Brimstone* opinion, *see* 276 U.S. at 121–22, 48 S.Ct. at 286–287, and was elaborated by this Circuit in *B & O*, where the court wrote:

> [w]here joint rates are agreed upon by the parties, we will not retroactively up-

---

7. *See* p. 978, *supra.*

set the division, on the equitable grounds that railroads might not agree on such rates if they suspected the possibility of court-imposed retroactive change. 506 F.2d 1265, 1269 (D.C.Cir.1974). The underlying rationale of the *Brimstone* doctrine is therefore that neither courts nor the Commission should disrupt parties' reasonable expectations of their rights under voluntarily negotiated agreements.

This rationale does not apply to bar courts from retroactive adjustment of MPS contracts. As the Commission pointed out, 358 I.C.C. at 647–48, section 11105 does not, in contrast to section 10705, instruct that private parties negotiate compensation rates but instead establishes that carriers must simply reimburse suppliers of MPS for the full cost of providing MPS, plus a reasonable profit. Thus, the supplier of MPS cannot negotiate to provide services other than at a fully compensatory rate. Since carriers are not afforded any opportunity for negotiation, they cannot have any legitimate expectation other than to award full compensation for MPS. Therefore, the concerns voiced in *Brimstone* and *B & O* about altering contractual expectations of private parties do not arise and cannot limit the courts' or the Commission's power to alter compensation for MPS retroactively.

In light of these differences, the Commission reasonably concluded that section 10705 should be strictly construed and applied so as not to bar the retroactive adjustment of MPS contracts. These differences distinguish the situation involved here from that where the *Brimstone* doctrine is appropriately applied and they specifically allay the doubts about possible disruption of parties' expectations that were expressed by this court in its earlier opinion, 412 F.Supp. at 1145. We therefore defer to the Commission's conclusion.

In light of the foregoing, in an accompanying order we grant the motions of defendants for summary judgment and to enforce the orders of the Interstate Commerce Commission dated July 27, 1978, and January 9, 1979. Plaintiffs' and plaintiff intervenors' motions for summary judgment are correspondingly denied.