593 F.2d 1305
 193 U.S.App.D.C. 151
 CAROLINA, CLINCHFIELD AND OHIO RAILWAY, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Association of Regulatory Utility Commissioners, Intervenor.
 No. 77-1665.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 26, 1978.
Decided Jan. 23, 1979.
 
 Stuart C. Stock, Washington, D. C., with whom Michael Boudin, Washington, D. C., and Peter J. Hunter, Jr., Roanoke, Va., were on the brief, for petitioners.
 Kenneth G. Caplan, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, I. C. C., Robert B. Nicholson and Cathy G. O'Sullivan, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 Charles A. Schneider, Asst. Gen. Counsel, National Ass'n of Regulatory Utility Commissioners, Washington, D. C., with whom Paul Rodgers, Gen. Counsel and William R. Nusbaum, Deputy Asst. Gen. Counsel, National Ass'n of Regulatory Utility Commissioners, Washington, D. C., were on the brief, for intervenors.
 Also Henri F. Rush, Associate Gen. Counsel, I. C. C., Washington, D. C., entered an appearance for respondent.
 Before WRIGHT, Chief Judge, and LEVENTHAL and WILKEY, Circuit Judges.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 WILKEY, Circuit Judge:
 
 
 1
 This case involves the procedures through which the Interstate Commerce Act protects railroads from intrastate rates which discriminate against interstate commerce. Petitioners, certain interstate railroads operating in the state of North Carolina, seek review of Interstate Commerce Commission orders[1] rejecting a tariff filing which the Commission claims it has no authority to process. The tariff sought to apply to traffic moving wholly within North Carolina a four per cent general rate increase that had previously been filed and placed into effect for interstate traffic nationwide, including North Carolina. We believe the Commission has correctly construed its statutory authority affecting intrastate rates and, accordingly, we affirm.
 
 I. BACKGROUND
 A. History and Statutory Structure
 
 2
 An understanding of this controversy requires a little background. At least since the Shreveport case[2] it has been settled that there is federal authority under the Commerce Clause to regulate Intrastate rates which affect interstate commerce. Congress exercised this authority in the Transportation Act of 1920 which, by adding new paragraphs (3) and (4) to § 13[3] of the Interstate Commerce Act, in effect codified the Shreveport decision.[4] Section 13(3) authorized the Commission to investigate intrastate rates and § 13(4) expressly empowered the Commission to "prescribe" intrastate rates in order to cure undue discrimination against interstate commerce, but only "after (a) full hearing."
 
 
 3
 The procedures which have historically governed Interstate ratemaking are quite different. These are set out in § 15 of the Act.[5] Under these provisions the ratemaking initiative lies with the railroads. Rate changes are filed with the ICC[6] and take effect immediately unless suspended by the Commission. Section 15(8) provides that when a tariff schedule is filed, the Commission, on its own initiative or on complaint of an interested party, may conduct a hearing to determine if the proposed rates are lawful.[7] If a hearing is held, the Commission may suspend operation of the new rates for a maximum of seven months, but only if it is shown by a complainant (1) that the proposed rate change will cause him substantial injury and (2) that he is likely to prevail on the merits.[8] Although the complainant has the burden of establishing the conditions for a suspension,[9] the railroads have the ultimate burden of proving that their rates are lawful.[10]
 
 
 4
 Petitioners contend that this long-standing difference in the procedures governing interstate and intrastate ratemaking was changed by the addition in 1976 of a new paragraph (5) to § 13 of the Act.[11] Section 13(5) allows state regulatory authorities 120 days to act upon carrier applications to adjust intrastate rates to correspond to the rates for similar interstate traffic. However, if the state authority has not "acted finally" within the 120-day period, the ICC is given "exclusive authority . . . to prescribe the intrastate rate." Petitioners argue that the grant of "exclusive authority" to the ICC entitles the railroads to file intrastate rate changes pursuant to § 15(8), just as they file interstate rates, thus making intrastate rate changes automatically effective unless a complainant can meet the § 15(8) burden. The Commission disagrees, maintaining that § 13(4), with its "full hearing" requirement, affords the exclusive means of affecting intrastate rates contemplated by the Act.
 
 
 5
 Finally, the Interstate Commerce Act was newly codified in October 1978, shortly before this case was argued. Although Congress expressly stated that it intended no substantive change in the law, it did alter the structure and wording of numerous provisions, including §§ 13(4) and 13(5).[12] We think the codification largely resolves against petitioners the ambiguities which led to the instant controversy, but it should be recalled that the parties proceeded throughout on the basis of the earlier version.
 
 
 6
 B. The Course of These Proceedings.
 
 
 7
 1. The X-336 Proceeding.
 
 
 8
 On 9 November 1976 the nation's railroads petitioned the ICC for permission to file a master tariff and connecting supplements in order to implement a general four percent increase on freight rates nationwide. The petition showed that the railroads had experienced increases in annual operating costs of nearly $1 billion.[13] Even were the rate increase implemented nationwide on both interstate and intrastate traffic, there would have been a revenue shortfall of some $300 million.[14] The Commission permitted[15] the railroads to file master tariff X-336 to effect the four percent increase nationwide for interstate traffic. Finding the railroads' revenue needs unquestionable, the ICC concluded that it was unnecessary to suspend and investigate the X-336 tariff as permitted under section 15(8).[16] The Commission concluded that the increase was "necessary to prevent a further decline in the railroads' overall financial condition"; that the railroads' rate of return continued to be "substandard"; and that, absent the increase, the railroads would not have "sufficient funds . . . to defray the cost escalations" established.[17]
 
 
 9
 2. The North Carolina Proceedings.
 
 
 10
 As is ordinarily the case, the cost increases justifying the four percent general rate increase in tariff X-336 affected intrastate as well as interstate traffic. Consequently, the southern railroads in January 1977 began to seek, through state proceedings, identical increases in intrastate rates in each of the states within the Southern Freight Association Territory. The increase was eventually accepted and implemented in each of those states, except North Carolina.[18]
 
 
 11
 On 4 January 1977 the railroads filed with the North Carolina Utilities Commission (NCUC) a tariff supplement which would have applied the four percent increase to North Carolina traffic. The NCUC suspended the increase until 6 November 1977 and began an investigation.[19] Because the NCUC did not act finally on the railroads' four percent increase within 120 days after the filing of the tariff supplement, the railroads moved to discontinue the proceedings, arguing that § 13(5) had ousted the North Carolina authorities of jurisdiction. The NCUC terminated its investigation by order of 16 May 1977.[20]
 
 
 12
 3. The ICC Proceeding.
 
 
 13
 On 9 May 1977 the railroads petitioned the Commission to investigate the allegedly discriminatory North Carolina rates pursuant to its § 13(4) authority. An investigation was ordered on 25 May 1977.[21]
 
 
 14
 On 31 May 1977 the railroads sought to invoke what they conceived to be an alternative procedure for implementing the intrastate rate increase under § 13(5). The railroads filed with the ICC tariff supplement S-20 to master tariff X-336 in order to apply the general increase to North Carolina traffic. Contemplating the ordinary course of practice under §§ 6 and 15, the railroads filed the supplements to become effective on 7 July 1977, after more than 30 days notice, unless suspended by the ICC.
 
 
 15
 The Commission rejected tariff supplement S-20 by letter of 5 July 1977.[22] Noting that an investigation into the North Carolina rates had been docketed pursuant to § 13(4), the letter asserted that there was no "authority" to establish the increase "(i)nasmuch as no order of the Commission has been served authorizing the increase to be placed in effect."[23]
 
 
 16
 The railroads appealed the decision letter within the Commission. On 18 July 1977, Division 2 of the ICC denied the railroads' application for review,[24] finding that the railroads were required to observe the existing rates until the Commission had concluded its § 13(4) investigation of those rates.
 
 
 17
 Ten days later, the railroads sought review in this court[25] and a stay of the orders Pendente lite. On 13 September 1977, without ruling on the motion for a stay, we remanded the record and directed the Commission to file a supplemental memorandum regarding the railroads' motion. While the record was on remand, Division 2 entered a further order on 6 October 1977.[26] The latest order reaffirmed the 18 July order, although on slightly different grounds, disclaiming authority to process the railroads' tariff supplement pursuant to §§ 13(5) and 15(8).
 
 
 18
 Finally, during the course of the filing controversy, the ICC had been conducting its investigation of the North Carolina rates pursuant to § 13(4). On 18 November 1977 the Administrative Law Judge (ALJ) found that the North Carolina rates caused an unjust discrimination against interstate commerce and ordered that the rates be raised to the interstate level.[27] After 30 days, no exceptions having been filed, this ruling became the final decision of the ICC. In light of the outcome of the § 13(4) proceeding, the Commission moved for dismissal of the instant petition for review, arguing that the controversy had become moot. The motion to dismiss was denied and our review followed.
 
 II. ANALYSIS
 
 19
 This case requires us to construe the ICC's statutory authority over intrastate rates. If, as petitioners contend, § 13(5) permits the Commission to process rates under the procedures set out in § 15(8), we may assume without deciding that the Commission could not otherwise decline to exercise its jurisdiction.[28] We interpret the statutory language at issue in light of its legislative history and the Congressional purpose which that history discloses. Although we entirely agree that petitioners' construction is consistent with the general purposes Congress apparently had in enacting the 1976 amendments, we cannot accept it as our own for two reasons. First, the construction is linguistically implausible and second, we are particularly reluctant to rewrite statutes affecting sensitive issues of federalism.
 
 
 20
 A. Statutory Language.
 
 
 21
 As we have noted, the provisions we are called upon to interpret were recodified shortly before oral argument in this case. Some of the language has been changed, but we are told that this worked no substantive change in the law.[29] The new language is much clearer, however, with respect to the procedures for changing intrastate rates. We think the persuasiveness of petitioners' position is undercut by the fact that their construction would never occur to us from reading the pertinent codified passages of the Act. Concededly, the language in which § 13(5) was originally enacted is not entirely irrelevant and could somewhat plausibly be construed as petitioners suggest.[30] Of course, if the original version had had some established or fairly obvious meaning, that understanding would largely inform our construction of the codification.[31] However, particularly because the codified language admits of little doubt, if any, we do not find the mere ambiguity in the earlier language of much help.
 
 
 22
 Sections 13(4) and 13(5) were codified, as we have said, as 49 U.S.C. § 11501.[32] Section 11501(b)(1) provides that the Commission "has exclusive authority to prescribe" an intrastate rate where (A) a railroad has filed an application with a state authority to adjust such rate to the similar interstate rate and (B) the state authority has not "acted finally" within 120 days. Section 11501(b)(2) provides that the Commission shall "prescribe" the intrastate rate under the standards of § 11501(a)(1) which restated the criteria formerly contained in § 13(4). Finally, § 11501(c) provides that the Commission may take action under the section "only after a full hearing."
 
 
 23
 It is apparently undisputed that the Commission obtained exclusive authority over the controversy pursuant to § 11501(b)(1). The live question is what this entails procedurally. Petitioners opine that the Commission, having ousted the state of jurisdiction, should treat the rate like any other over which it has exclusive jurisdiction (I. e., all interstate rates) and permit filing under § 15(8), codified as 49 U.S.C. § 10707.
 
 
 24
 Petitioners' analysis of the statute's "plain language" is straightforward and, we think, wrong. Section 10707 is said to be entirely general, applying to all rate changes over which the Commission has authority.[33] Inasmuch as § 11501 gives the Commission "exclusive authority" over certain intrastate rates, § 10707 must likewise apply. The "full hearing" requirement of § 11501(c) is said to be inapposite as it applies only to rates which the Commission imposes and not to those initiated by railroads under § 10707.[34]
 
 
 25
 We begin with the observation that the Commission's statutory authority over intrastate rates derives entirely from § 11501;[35] and we do not think that that section's use of the phrase "exclusive authority," without more, enables railroads to implement changes in intrastate rates simply by filing them with the ICC. Apart from being scant predicate for such an abrupt departure from practice, the phrase in any event cannot sensibly be read as an operative cross-reference to § 10707. Section 11501 nowhere refers to § 10707 or to equivalent procedures, and a reference cannot, we think, fairly be implied from the language. The "exclusive authority" which the Commission is given is not plenary, but rather is expressly confined by § 11501(b) to prescribing an intrastate rate under the circumstances set out in subsection (b)(1) and the substantive standards set out in § 11501(a). Moreover, when the Commission thus prescribes an intrastate rate, it is plainly "tak(ing) action under . . . section (11501)" for purposes of the prior hearing requirement in § 11501(c). Thus it is fairly apparent on the face of the statute that the Commission's power to prescribe rates under § 11501 exhausts its authority over intrastate rates and is governed, Inter alia, by the requirement of a hearing in subsection (c).[36]
 
 
 26
 B. Congressional Purposes and Intent.
 
 
 27
 Were the meaning of the statutory language less plain, we would be somewhat inclined to adopt petitioners' construction in light of the apparent purposes of the 1976 amendments. The legislative history of the 1976 amendments contains extensive Congressional findings about the financial decline of the industry, occasioned in no small part by the "cumbersome slow process of making rates."[37]
 
 
 28
 The ratemaking scheme advanced by petitioners would be a quite rational answer to the damaging delays which have often occurred before discriminatory intrastate rates are raised to the interstate level. Under petitioners' construction, after 120 days of inaction by the state authorities the railroads would place the rates into effect by filing them (with notice) under § 10707. Shippers would be protected from unlawful rates through the customary suspension and refund provisions of § 10707,[38] and the autonomy of the states would be assured for at least the 120 day exhaustion period.
 
 
 29
 Moreover, this construction would avoid some anomalous possibilities admitted by the scheme Congress chose. First, to the extent that § 11501 ousts the Commission of concurrent jurisdiction for 120 days,[39] it may (if state authorities do not take their national obligations seriously) simply tack that period of delay onto the time ordinarily consumed by a § 13(4) investigation. Second, if state authorities do not act within 120 days, there will always be some period of time during which no one may implement the rates the state may not, having been ousted of jurisdiction, and the ICC may not until it has conducted the "full hearing" assured by § 11501.[40] Although to be sure the paralysis would be relieved by expediting the ICC hearing, former tardigrade practice is not a source of hope.
 
 
 30
 Of course, petitioners' construction would not be free of anomaly either. The procedural consequences attaching to the passage to 120 days without "final action" might encourage the railroads to delay state proceedings in order to avail themselves of § 10707. On the other hand, state authorities could bar recourse to § 10707 simply by acting even if summarily and adversely, on the 119th day. Although we would not expect such perverse behavior,[41] it is hardly a strong argument for petitioners' construction that such conduct would be encouraged.
 
 
 31
 In any event, we think it apparent that the changes intended by Congress, at least in enacting § 13(5), were undramatic. Although other of the 1976 amendments did streamline aspects of railroad ratemaking,[42] § 13(5) operates, we think, exclusively as a jurisdictional provision. That is, of course, precisely what its minimal legislative history said that it did. The Conference Committee Report states:
 
 
 32
 (The bill) assure(s) State regulatory bodies at least 120 days exclusive jurisdiction over an intrastate rate case, require(s) a railroad to exhaust its State remedy for a change in intrastate rates, and provide(s) that if a State failed to act on the railroad's application for rate change within 120 days the Interstate Commerce Commission would have exclusive authority to determine these intrastate rates.[43]
 
 
 33
 Insofar as § 13(5) may be said to expand federal authority over intrastate rates, it does so only by ousting the states of their former concurrent jurisdiction after 120 days of inaction. As we have explained, the language Congress chose cannot support a more expansive reading, and nothing in the legislative history suggests its choice of language was mere drafting error.
 
 
 34
 Even were the linguistic argument closer, we would be hesitant to construe loosely an ambiguous passage so as to unsettle the practice of conducting a prior hearing. A finding (after hearing) of discrimination against interstate commerce has always conditioned the exercise of federal power over intrastate rates.[44] Inasmuch as the most plausible construction of the statute's language would continue the practice, we decline to strain a reading which Congress could freely enact, especially in view of Congress' historic sensitivity to the legitimate role of the states in this field.
 
 III. CONCLUSION
 
 35
 We believe that the railroads are not entitled by § 11501, formerly § 13(5), to place changes in intrastate rates into effect by filing them with the Commission under § 10707. Rather, federal authority to affect intrastate rates is confined to the power of the Commission to prescribe rates "after a full hearing." Adopting this construction, however, we do not imply that the Commission should ignore the urgency which prompted Congress to enact the 1976 amendments. It is plain that in giving the ICC exclusive authority Congress intended that it move expeditiously in prescribing rates after the statutory exhaustion period. The substantive inquiry called for when intrastate rates recurrently lag behind general interstate rate increases is straightforward. The interstate rate will ordinarily already have been found just and reasonable. The Commission may confine the hearing to the ostensible justifications for the varying intrastate rate. We contemplate that the Commission will devise appropriately expedited procedures to avoid all escapable delay.[45]
 
 
 36
 Affirmed.
 
 
 
 [1]
 ICC Staff Letter of 5 July 1977, Reprinted in Joint Appendix (J.A.) at 3, Reconsideration denied, ICC Order of 18 July 1977, Docket No. 36630 (Division 2, acting as an Appellate Division, served 21 July 1977), Reprinted in J.A. at 4, Clarified, ICC Order of 6 October 1977, Docket No. 36630 (Division 2, served 7 October 1977), Reprinted in J.A at 13
 
 
 [2]
 Houston, E. & W. T. Ry. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914)
 
 
 [3]
 Transportation Act of 1920, ch. 91, § 416, 41 Stat. 484 (1920) (revised and codified as 49 U.S.C. §§ 11501-02, formerly 49 U.S.C. §§ 13(3)-(4) (1970)
 
 
 [4]
 See North Carolina v. United States, 325 U.S. 507, 513, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945); Bd. of Railroad Comm'rs v. Great Northern R. Co., 281 U.S. 412, 425-26, 50 S.Ct. 391, 74 L.Ed. 936 (1929)
 
 
 [5]
 See Interstate Commerce Act, § 15(8), Revised and codified as 49 U.S.C. § 10707 (formerly 49 U.S.C.A. § 15(8) (1978)). Section 15(8), which was added to the Act in 1976, See Pub.L. No. 94-210, tit. II, § 202(e)(2), 90 Stat. 37 (1976), was itself a revision, as to rail carriers, of the provisions formerly governing under § 15(7). See United States v. SCRAP, 412 U.S. 669, 672-73, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)
 
 
 [6]
 See Interstate Commerce Act, § 6(1) and (3), Revised and codified as 49 U.S.C. §§ 10761-62 (formerly 49 U.S.C. § 6(1) and (3) (1970))
 
 
 [7]
 See Interstate Commerce Act, § 15(8)(a), Revised and codified as 49 U.S.C. § 10707(a) (formerly 49 U.S.C.A. § 15(8)(a) (1978))
 
 
 [8]
 See Interstate Commerce Act, § 15(8)(d), Revised and codified as 49 U.S.C. § 10707(c) (formerly 49 U.S.C.A. § 15(8)(d) (1978)). The suspension may be extended to 10 months under certain circumstances. 49 U.S.C. § 10707(c)(1)
 
 
 [9]
 See Interstate Commerce Act, § 15(8)(d), Revised and codified as 49 U.S.C. § 10707(c)(2) (formerly 49 U.S.C.A. § 15(8)(d) (1978))
 
 
 [10]
 See Interstate Commerce Act, § 15(8)(f), Revised and codified as 49 U.S.C. § 10707(e) (formerly 49 U.S.C.A. § 15(8)(d) (1978))
 
 
 [11]
 Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, tit. II, § 210, 90 Stat. 46 (Revised and codified as 49 U.S.C. § 11501 See note 12 Infra ). Section 13(5) provided:
 § 13, par. (5). Exclusive authority to determine and prescribe intrastate rates; prerequisites; procedures
 The Commission shall have exclusive authority, upon application to it, to determine and prescribe intrastate rates if
 (a) a carrier by railroad has filed with an appropriate administrative or regulatory body of a State, a change in an intrastate rate, fare, or charge, or a change in a classification, regulation, or practice that has the effect of changing such a rate, fare, or charge, for the purpose of adjusting such rate, fare, or charge to the rate charged on similar traffic moving in interstate or foreign commerce; and
 (b) the State administrative or regulatory body has not, within 120 days after the date of such filing, acted finally on such change.
 Notice of the application to the Commission shall be served on the appropriate State administrative or regulatory body. Upon the filing of such an application, the Commission shall determine and prescribe, according to the standards set forth in paragraph (4) of this section, the rate thereafter to be charged. The provisions of this paragraph shall apply notwithstanding the laws or constitution of any State, or the pendency of any proceeding before any State court or other State authority. Nothing in this paragraph shall affect the authority of the Commission to institute an investigation or to act in such investigation as provided in paragraphs (3) and (4) of this section.
 
 
 [12]
 Act of 17 October 1978, Pub.L. No. 95-473, 92 Stat. 1337. Sections 13(4) and 13(5) were newly codified as 49 U.S.C. § 11501:
 § 11501. Interstate Commerce Commission authority over intrastate transportation
 (a)(1) The Interstate Commerce Commission shall prescribe the rate, classification, rule, or practice for transportation or service provided by a carrier subject to the jurisdiction of the Commission under subchapter I or IV of chapter 105 of this title when the Commission finds that a rate, classification, rule, or practice of a State causes
 (A) between persons or localities in intrastate commerce and in interstate and foreign commerce, unreasonable discrimination against those persons or localities in interstate or foreign commerce; or
 (B) unreasonable discrimination against or imposes an unreasonable burden on interstate or foreign commerce.
 (2) The Commission may make a finding under this subsection involving a carrier providing transportation subject to its jurisdiction under subchapter I of chapter 105 of this title without separating interstate and intrastate property, revenues, and expenses, and without considering the total operations, or their results, of a carrier or group of carriers operating entirely in one State.
 (b)(1) The Commission has exclusive authority to prescribe an intrastate rate for transportation provided by a rail carrier subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title when
 (A) a rail carrier files with an appropriate State authority for change in an intrastate rate, or a change in a classification, rule, or practice that has the effect of changing an intrastate rate, that adjusts the rate to the rate charged on similar traffic moving in interstate or foreign commerce; and
 (B) the State authority does not act finally on the change by the 120th day after it was filed.
 (2) When a rail carrier files an application with the Commission under this subsection, the Commission shall prescribe the intrastate rate under the standards of subsection (a) of this section. Notice of the application shall be served on the State authority.
 (c) The Commission may take action under this section only after a full hearing. Action of the Commission under this section supersedes State law or action taken under State law in conflict with the action of the Commission.
 
 
 [13]
 See Petition, 9 November 1976, at 9
 
 
 [14]
 Id
 
 
 [15]
 ICC Order of 12 November 1976, reproduced as Appendix C to Brief for Petitioners
 
 
 [16]
 ICC Order of 21 December 1976, reproduced as Appendix D to Brief for Petitioners
 
 
 [17]
 Id. at 1
 
 
 [18]
 See Brief for Petitioners at 13 and n. 34
 
 
 [19]
 NCUC Order of 26 January 1977, in NCUC Dkt. No. R-66, Sub. 83, reproduced as Appendix E of Brief for Petitioners
 
 
 [20]
 NCUC Order of 16 May 1977, in NCUC Dkt. No. R-66, Sub. 83, reproduced as Appendix F of Brief for Petitioners
 
 
 [21]
 North Carolina Intrastate Freight Rates and Charges 1977, Docket No. 36581 (25 May 1977)
 
 
 [22]
 ICC Staff Letter of 5 July 1977. The letter is reprinted in the J.A. at 3
 
 
 [23]
 Id
 
 
 [24]
 ICC Order of 18 July 1977, Docket No. 36630 (Division 2, served 21 July 1977). The order is reprinted in the J.A. at 4
 
 
 [25]
 The jurisdiction of this court was properly invoked pursuant to 28 U.S.C. §§ 2341-50 (1976)
 
 
 [26]
 ICC Order of 6 October 1977, Docket No. 36630 (Division 2, served 7 October 1977). The order is reprinted in the J.A. at 13
 
 
 [27]
 ICC Order, Docket No. 36581 (served 18 November 1977)
 
 
 [28]
 Cf. Delta Air Lines, Inc. v. CAB, 177 U.S.App.D.C. 100, 105-07, 543 F.2d 247, 252-54, 261 (1976); Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 299, 450 F.2d 1341, 1346 (1971), Cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972)
 
 
 [29]
 The codifying statute and its legislative history make plain that Congress intended no substantive change in any provision of the Act. Public Law No. 95-473 is specifically titled "(a)n Act to revise, codify and enact Without substantive change the Interstate Commerce Act and related laws . . . ." (Emphasis added.) Section 3(a) of the statute likewise declares that the codification "restate(s) Without substantive change, laws enacted before May 16, 1978, that were replaced" by the codification. 92 Stat. 1466 (emphasis added). The legislative history contains numerous statements to the same effect. See, e. g., H.R.Rep. No. 1395, 95th Cong., 2d Sess. 9, U.S.Code Cong. & Admin.News, 1978, pp. 3009, 3018 (provisions of the Interstate Commerce Act are "intended to remain substantively unchanged")
 
 
 [30]
 Some of petitioners' finer parsing of the statutory language was quite undone by the codification. For example, § 13(5), as enacted, provided that the Commission had exclusive authority to "Determine and prescribe" intrastate rates under the circumstances set out in the section. (Emphasis added.) Because § 15(8) defined the Commission's customary authority to "determine" the lawfulness of rates, it was argued that in using that word in § 13(5), Congress intended that the practice of § 15(8) would govern ratemaking in those cases over which § 13(5) gave the Commission exclusive authority. See Brief for Petitioners at 20-21. In codifying the first sentence of § 13(5) in 49 U.S.C. § 11501(b)(1), the revisers deleted the phrase "determine and," in order "to eliminate redundancy." H.R.Rep. No. 1395, 95th Cong., 2d Sess. 176 (1978). Petitioners rather courageously opine that the revisers "apparently considered the term 'prescribe' sufficiently broad to encompass ICC determination" under § 15(8). See Supplemental Memorandum for Petitioners at 6-7. We think rather that the excision of the allegedly operative language as redundant is all but fatal to petitioners' purely linguistic argument
 Petitioners additionally argued that the last sentence of § 13(5) showed that Congress contemplated an alternative to the procedures in § 13(4). That sentence stated that "(n)othing in this (section) shall affect" the Commission's authority "to institute an investigation" or otherwise act under § 13(3) and (4). Apart from the fact that this language too was omitted from the codification, we think its probable meaning differs somewhat from what petitioners believe. In light of the apparent intention of Congress to require that railroads exhaust their state remedies for up to 120 days, See note 43 Infra, it is likely that the proviso in the last sentence of § 13(5) merely reserves the Commission's power to proceed during the exhaustion period on its own initiative and, of course, under § 13(4).
 
 
 [31]
 See Cass v. United States, 417 U.S. 72, 82, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974); Greenwood v. Peacock, 384 U.S. 808, 815, 816, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966)
 
 
 [32]
 See note 12 Supra
 
 
 [33]
 See Supplemental Memorandum of Petitioners at 5-6
 
 
 [34]
 Id
 
 
 [35]
 There are a number of collateral provisions affecting federal-state relations, not involved in this case, contained in 49 U.S.C. §§ 11502-07
 
 
 [36]
 It would seem especially unwarranted to infer an intention to incorporate the procedures in § 15(8) in light of the apparent comprehensiveness with which Congress prescribed the procedures under § 11501
 
 
 [37]
 S.Rep. No. 499, 94th Cong., 1st Sess. 2-3 (1975). See also H.R.Rep. No. 725, 94th Cong., 1st Sess. 54-55 (1975)
 
 
 [38]
 49 U.S.C. § 10707(c) (formerly 49 U.S.C.A. § 15(8)(b) and (e) (1978))
 
 
 [39]
 See note 43 Infra
 
 
 [40]
 Of course, in those cases in which the state would not, for whatever reasons, ever take corrective action, ousting it of jurisdiction is harmless. The objection to the construction we adopt must be (apart from petitioners' primary quarrel that it denies them use of § 15(8)) that it forecloses corrective state action which would fall after 120 days but before the ICC would have occasion to hold a hearing. States may avoid being ousted of jurisdiction, of course, by simply completing their proceedings within 120 days. Where the Commission has cause to expect state action will be dilatory, apparently it may proceed on its own initiative before 120 days have passed. See note 30 Supra
 
 
 [41]
 It is not obvious that our expectations are justified. For example, there may have been some such dilatory conduct in Montana Intrastate Freight Rates and Changes, 357 I.C.C. 281 (1978). There the Commission said:
 At the State proceeding the carriers did not file any evidence within the 30-day statutory period. Nor did they respond to interrogatories with substantive answers. Having no evidence, Montana could do nothing substantive within 120 days. It lost jurisdiction.
 In future proceedings, before State commissions, the railroads are cautioned to cooperate with State authorities. A failure on their part to provide "relevant" cost and traffic evidence may be justification for this Commission to postpone investigation until such evidence is submitted to the State authorities.
 Id. at 283, 284; See also id. at 297 (concurring opinion of Commissioner Murphy).
 
 
 [42]
 See, e. g., Railroad Revitalization and Regulatory Reform Act 1976, Pub.L. No. 94-210, tit. III, § 303, 90 Stat. 48 (revised and codified as 49 U.S.C. § 10327, formerly 49 U.S.C.A. § 17(9) (1978))
 
 
 [43]
 H.R.Rep. 94-781, 94th Cong., 2d Sess. 155 (1976)
 In fairness to petitioners, the license taken with the statutory language in order to infer a reference to § 15(8) is modest compared to the gloss which Congress places on its own words. Nevertheless, it is Congress' intent, although unapparent from the face of the statute, which is controlling. Of course, the precise effects of Congress' less obvious intentions (requiring railroads to exhaust state remedies and giving states exclusive authority for 120 days) are for another day.
 However, we note that the intention to make the state jurisdiction exclusive for 120 days, at least as to changes sought on motion of the railroads, would explain the excision by the 1976 act of the proviso in former § 13(4) requiring that, upon the filing of a petition under § 13(3) (challenging the lawfulness of an intrastate rate), the Commission "shall forthwith" investigate the rate "whether or not theretofore considered by any State agency . . . and without regard to the pendency before any State agency" of any related proceeding. See Pub.L. No. 94-210, tit. II, § 210, 90 Stat. 46. That proviso had been construed, in at least one case, to remove the Commission's discretion (which it had customarily exercised) to await completion of state proceedings prior to commencing a § 13(4) investigation. North Carolina ex rel. North Carolina Utilities Commission v. ICC, 347 F.Supp. 103, 109 (E.D.N.C.1972), Aff'd, 410 U.S. 919, 93 S.Ct. 1362, 35 L.Ed.2d 582 (1973). It was apparently Congress' intention in the 1976 Act to restore and make nondiscretionary the prior informal practice of exhausting state remedies, at least for 120 days, but subject to the Commission's reserved power to proceed on its own initiative in proper cases within the 120 days. See note 30 Supra.
 
 
 [44]
 Former practice governed by § 13(5) cannot, of course, dispose of the construction of an amendment which arguably changes the practice. We merely note the deference historically accorded the states in intrastate ratemaking. See North Carolina v. United States, 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945) ("intra-state transportation is primarily the concern of the state. The power of the Interstate Commerce Commission with reference to such intra-state rates is dominant only so far as necessary to alter rates which injuriously affect interstate transportation.")
 
 
 [45]
 The choice of hearing procedures is, of course, with the Commission in the first instance. See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The choice, however, including the duration of hearings, had been limited somewhat by statute. See 49 U.S.C. § 10327 (formerly 49 U.S.C.A. § 17(9) (1978) (imposing time limits on various Commission proceedings)