617 F.2d 485
 The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al.,
and Railway Labor Executives' Association, Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
The State of New Mexico, etc., Intervening Respondent,
Southern Pacific Transportation Company and St. Louis
Southwestern Railway Company, Intervening Respondents.
 Nos. 79-2461, 79-2478.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 22, 1980.
Decided March 20, 1980.
 
 John E. Haley, Sidley & Austin, John O'Brien Clarke, Jr., Washington, D. C., for petitioners.
 Richard A. Allen, I. C. C., Washington, D. C., for respondents.
 John R. Labovitz, Steptoe & Johnson, Washington, D. C., for intervenor-respondent.
 Before FAIRCHILD, Chief Judge, and SWYGERT and BAUER, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 The issue in these consolidated petitions for review is whether the Interstate Commerce Commission ("the Commission") properly exercised its emergency powers under section 11123 of the Interstate Commerce Act ("the Act"), 49 U.S.C. § 11123, when it authorized the St. Louis Southwestern Railway Company (SSW) to operate temporarily over 965 miles of track owned by the Chicago, Rock Island & Pacific Railroad Company (Rock Island) which is bankrupt. Petitioner railroads and the Railroad Labor Executives Association ("RLEA") contend that the Commission exceeded its statutory authority under sections 11123(a)(2) and 11123(a)(4), 49 U.S.C. §§ 11123(a)(2) and (4), on which the Commission relied.[1] In addition, petitioner railroads argue that the threshold requirement of an "emergency requiring immediate action" in section 11123(a), 49 U.S.C. § 11123(a), was not met and that the Commission's order has no rational basis in the record. Because we conclude that the Commission lacked the statutory authority under both provisions on which it relied, we do not reach petitioner railroads' alternative contentions.
 
 
 2
 * The railroad lines which are the subject of the Commission's order constitute a main line segment of the Rock Island's tracks. The "Tucumcari line," as that segment is called, extends from Santa Rosa, New Mexico, to St. Louis, Missouri, via Kansas City, Missouri, for a total distance of 965.2 miles.
 
 
 3
 In March 1975 the Rock Island filed a petition for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C. § 205. A trustee was appointed by the reorganization court and approved by the Commission. While attempting to formulate a feasible reorganization plan, the trustee has continued to operate the Rock Island. In December 1978 the Rock Island trustee, joined by the Southern Pacific Transportation Company ("SPT") and its subsidiary, SSW, filed an application with the Commission seeking approval of a purchase agreement whereby the SSW would pay fifty-seven million dollars to buy the Tucumcari line. The Commission has engaged in extensive hearings concerning the application, which is still pending at the present time.[2] The petitioners in the case at bar have vigorously opposed the proposed purchase at all stages of the Commission's proceedings.
 
 
 4
 During the five years since the Rock Island filed its petition for reorganization, it has been unable to substantially improve its financial condition. In August 1979 two railroad unions struck the Rock Island and other union employees honored their picket line. Because of the strike, the Rock Island management was unable to continue essential service, and on September 20, 1979 President Carter invoked section 10 of the Railway Labor Act, 45 U.S.C. § 160, establishing an Emergency Board to intervene in the Rock Island labor dispute and ordering the striking workers to return to work. The President further stated that "because the Rock Island is critically short of cash, it is possible that the railroad will not be able to restore service on its own, even with this action." He thus asked the Commission to "take the steps needed . . . to maintain service . . . during this period of record-breaking grain harvests." Exec.Order No. 12,159, 44 Fed.Reg. 54687 (Sept. 21, 1979).
 
 
 5
 Four days later, on September 26, 1979, the Commission issued a directed service order under 49 U.S.C. § 11125 on the basis that Rock Island line was "currently suffering from a lack of cash which makes its continuing operations impossible in the face of national transportation requirements."[3] The Kansas City Terminal Railway Company ("KCT") was directed by the Commission to provide service over substantially all the Rock Island lines, including the Tucumcari line.[4] On November 30, 1979 the Commission extended its directed service order and directed KCT to continue service for an additional ninety days over a slightly reduced portion of the Rock Island tracks, including the entire Tucumcari line.[5]
 
 
 6
 On the same day as the Executive Order was issued and before the Commission had ordered directed service, the St. Louis Southwestern Railway Company with the support of the trustee for the Rock Island filed an application seeking authority to operate temporarily over the Tucumcari line pending final Commission action on its purchase application. SSW stated that it would provide the service at its own expense and that the Commission had "implied power" in an emergency to grant its application.
 
 
 7
 On September 27, 1979 the Commission served a notice inviting comments on SSW's petition for temporary authority. By December 3, 1979, the date of the Commission's decision granting the application, sixteen replies had been received by the Commission. Four parties favored granting the petition, eleven were opposed, and one party was neutral. The protestants challenged the Commission's statutory authority to issue an order, maintained that the order would prejudice their rights as parties adverse to the application for purchase of the Tucumcari line pending before the Commission, pointed out numerous operating problems with joint service by SSW and KCT over the Rock Island's lines and stated that significant irreparable revenue losses would occur to them even under temporary SSW control of the Tucumcari line.
 
 
 8
 On December 7, 1979, four days after the Commission had extended KCT's directed service authority to operate the Tucumcari line, the Commission entered Service Order No. 1411 ("the order") which is at issue here, granting SSW and its corporate parent, Southern Pacific Transportation Company (SPT), emergency authority to operate temporarily over the Tucumcari line without Government subsidization. The Commission based its decision on section 11123 of the Interstate Commerce Act, 49 U.S.C. § 11123. The Commission stated that the grant of temporary authority to SSW was necessary because while directed service by KCT under section 11125, 49 U.S.C. § 11125, afforded a temporary answer to Rock Island's problems, it was not "a long-range solution or even an ideal short-term one." Directed service, the Commission noted, could not last for longer than 240 days and created a significant drain on the federal treasury. Relying on its expertise in the rail area, the Commission determined that an emergency existed within the meaning of section 11123, 49 U.S.C. § 11123, despite the implementation of directed service. The Commission also found that the grant of temporary authority to SSW to operate the Tucumcari line would reduce the drain on the federal treasury.
 
 
 9
 In its decision, the Commission stated that it was relying on subsections (2) and (4) of section 11123(a), 49 U.S.C. §§ 11123(a)(2) and (4). The Commission interpreted section 11123(a)(2) of the Interstate Commerce Act, 49 U.S.C. § 11123(a)(2), to provide the necessary authority because it empowered the Commission to "take action during (an) emergency to promote service in the interest of the public and of commerce regardless of the ownership (as between carriers) of a locomotive, car, or other vehicle . . . ." The Commission also interpreted section 11123(a)(4), 49 U.S.C. § 11123(a)(4), as authority for its order because that provision allowed the Commission to "give directions for . . . movement of traffic under permits." The Commission stated that its decision and order would remain in effect until either SSW's purchase application regarding the Tucumcari line was decided upon or the Commission found that the emergency is over.[6]
 
 
 10
 From the Commission's order granting SSW the temporary authority to operate over the Tucumcari line, petitioners bring these petitions for review. SSW and SPT, as well as the State of New Mexico, have intervened on behalf of the Commission.
 
 II
 
 11
 The petitioners argue that the Commission's order was beyond the statutory authority of the Commission under section 11123 of the Interstate Commerce Act, 49 U.S.C. § 11123.[7] The Commission and intervenors SPT, SSW, and the State of New Mexico contend that the order was expressly authorized by section 11123(a)(2), 49 U.S.C. § 11123(a)(2), permitting Commission action in an emergency "to promote service in the interest of the public," and by section 11123(a)(4), 49 U.S.C. § 11123(a)(4), allowing the Commission to "give directions for . . . movement of traffic under permits." Respondents also point out that this court must uphold the Commission's interpretation of the statute if it is reasonable.
 
 
 12
 Petitioners respond with a detailed analysis of the statutory language and the legislative history to support their contention that the language on which the Commission relied cannot be construed to allow the grant of temporary authority to one carrier to operate over approximately one thousand miles of another carrier's tracks. Further, the petitioners assert that section 11123 cannot be read to contain any general grant of emergency power.
 
 
 13
 Section 11123(a)(2), 49 U.S.C. § 11123(a)(2), provides:
 
 
 14
 When the Interstate Commerce Commission considers that . . . (an) emergency requiring immediate action exists in a section of the United States, the Commission may
 
 
 15
 (2) take action during the emergency to promote service in the interest of the public and of commerce regardless of the ownership (as between carriers) of a locomotive, car, or other vehicle . . . .
 
 
 16
 Respondents rely on the phrase "promote service" in this provision which they contend allows the Commission to grant authority to one carrier to operate over another carrier's tracks. Petitioners, on the other hand, argue that the word "service" in section 11123(a)(2) must be interpreted as meaning only car service and does not authorize the Commission's order which involves railroad tracks rather than railroad cars. To support their interpretation, petitioners point to the language of former section 49 U.S.C. § 1(15)(b), the predecessor provision to section 11123(a)(2):
 
 
 17
 Whenever the Commission is of the opinion that . . . (an) emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given, authority,
 
 
 18
 (b) to make such just and reasonable direction with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public.
 
 
 19
 Although it is conceded that former section 1(15)(b) was directed to car service, the Commission and SPT remind us that it is the "service" language of the recodified statute that we are interpreting rather than the "car service" language of the prior law.
 
 
 20
 It is axiomatic that "(t)he starting point in every case involving construction of a statute is the language itself." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976), quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring ). But it is also true that
 
 
 21
 (w)hen aid to construction of the meaning of words, as used in (a) statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may be on "superficial examination."
 
 
 22
 United States v. American Trucking Ass'ns, 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940). Further, "(a)s in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).
 
 
 23
 In this case, Congress has enacted a provision which twice and without qualification states that the recodification of this section effects no substantive change in the prior law:
 
 
 24
 Sections 1 and 2 of this Act restate, without substantive change, laws enacted before May 16, 1978, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced.
 
 
 25
 Section 3(a), Pub.L. No. 95-473, 92 Stat. 1337.[8]
 
 
 26
 We therefore agree with the District of Columbia Circuit that "(t)his prohibition against a construction of substantive change in the recodified Act will require this court to examine closely the language of the IC Act prior to recodification in order to determine the intent of Congress . . . ." Trailer Marine Transport Corp. v. Federal Maritime Commission, 195 U.S.App.D.C. 201, 205 n. 18, 602 F.2d 379, 383 n. 18 (D.C.Cir.1979). A comparison of the former and present statutes reveals that the recodified section essentially deleted the lengthy introductory phrase which contained the term "car service" and shortened the phrase "as in its opinion will best promote the service in the interest of the public," to read "to promote service in the interest of the public."[9] In both versions, the subsections conclude with reference to ownership of locomotives, cars, or other vehicles.
 
 
 27
 The preceding subsection of the recodified statute, 49 U.S.C. § 11123(a)(1) still refers specifically to "car service." Section 11123(a)(1) authorizes the Commission to "suspend any car service rule or practice." As we read subsections (1) and (2) of section 11123(a), together they authorize the Commission to suspend existing car service rules and replace them with new car service procedures to alleviate the emergency.
 
 
 28
 There is support for our joint construction of subsections (1) and (2), 49 U.S.C. § 11123(a)(1) and (2), in the following exchange which took place between Congressmen Crampton and Esch on the floor of the House of Representatives on May 9, 1917 when the predecessor section to section 11123(a) (2) was proposed:
 
 
 29
 Mr. Crampton. Is there not quite a substantial distinction in the fact that heretofore, when the commission has had authority to suspend the taking effect of a new schedule, the old-established schedule would continue in effect, whereas under this provision we are to give the commission authority to suspend not a new rule but perhaps a rule or regulation that has been many years in effect, and without any notice, either to the shippers or the carriers, and allow the commission to put in place of it an absolutely new rule or regulation ?Mr. Esch. Well, the gentleman must remember that this covers only cases of emergency.
 
 
 30
 55 Cong.Rec. 2022 (1917). (emphasis added.)
 
 
 31
 The Supreme Court has also read the two subsections together. Referring to the earlier enactment of these provisions, the Court stated: "Paragraph 15 (now section 11123(a)) deals in sub-paragraphs (a) (now subsection (1)) and (b) (now subsection (2)) with car service . . . ." Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 532, 44 S.Ct. 194, 195, 68 L.Ed. 427 (1924).
 
 
 32
 Were the "service" language in section 11123(a)(2) to be read as including more than car service as is suggested by the Commission, the recodified provision would be considerably broader than its predecessor section. It is undisputed that former section 1(15)(b) was limited to car service. Congress has unequivocally forbidden any interpretation that would substantively change the prior law. The Commission's reading of "service" ignores the explicit Congressional directive.
 
 
 33
 The Interstate Commerce Act cases cited by respondents, at most, state that the new language may be construed as clarifying prior ambiguities. Houston Lighting & Power Co. v. United States, 196 U.S.App.D.C. 224, 606 F.2d 1131 (D.C.Cir.1979), cert. denied, --- U.S. ----, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); Purolator Courier Corp. v. ICC, 598 F.2d 225 (D.C.Cir.1979); Carolina, Clinchfield & Ohio Ry. v. ICC, 193 U.S.App.D.C. 151, 593 F.2d 1305 (D.C.Cir.1979). In this case there were no prior ambiguities; it is not disputed that former section 1(15)(b) referred to "car service" and not to "service" in general. The two other cases cited are inapposite because they involve revised statutes where there was no congressional directive against substantive change. Continental Casualty Co. v. United States, 314 U.S. 527, 62 S.Ct. 393, 86 L.Ed. 426 (1942); Barbee v. United States, 392 F.2d 532, 535 (5th Cir. 1968), cert. denied, 391 U.S. 935, 88 S.Ct. 1849, 20 L.Ed.2d 855 (1968). We therefore conclude that "service" in section 11123(a)(2) connotes car service and cannot be interpreted more broadly.
 
 
 34
 The Commission and intervenors next contend that even if we construe section 11123(a)(2) as identical in meaning to former section 1(15)(b), we must uphold the Commission's order on the basis that the term "car service" includes the grant of authority for one carrier to operate over the tracks of another. "Car service" as defined in section 10102 of the recodified Act, 49 U.S.C. § 10102, includes "(A) the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, other vehicles, and special types of equipment used in the transportation of property by a rail carrier, and (B) the supply of trains by a rail carrier." 49 U.S.C. § 10102. As respondents read the provision, the Commission's order is authorized because it promotes car service that the Rock Island cannot provide. In other words, respondents ask that we interpret the phrase "to promote (car) service" as including a grant of authority to operate over another carrier's tracks so long as the result is an increase in cars on the Tucumcari line.
 
 
 35
 Petitioners argue that the "promote (car) service" language cannot be interpreted so broadly. They contend that "car service" must be interpreted so as to include only matters relating to the interchange of cars. Petitioners point out that although the interchange of cars has long been a fact of life among carriers, the interchange of tracks is rare. We take judicial notice of the fact that while our railroad system involves "a single common pool (of cars), used by all roads," United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 743, 92 S.Ct. 1941, 1944, 32 L.Ed.2d 453 (1972), it does not involve a single "common pool" of tracks. According to petitioners, the Interstate Commerce Act reflects this difference between the use of another carrier's cars and the use of another carrier's tracks, and speaks of "car service" only when referring to the former.
 
 
 36
 We agree with petitioners that section 11123(a)(2) cannot be interpreted to include the authority granted in the Commission's order. The relevant legislative and judicial history indicates that the definition of "car service" has remained limited and substantially the same over eighty years of use by the Commission and the railroad industry.
 
 
 37
 The first use of the term "car service" of which we are aware occurred in 1902, when the Nation's railroads, having abandoned the custom of shifting freight between the cars of connecting roads and having instituted the practice of interchanging the same loaded car to connecting lines to its ultimate destination, agreed upon a code of "car service rules" which regulated the return and in general the interchange of freight cars. The Interstate Commerce Act, as enacted in 1887, did not mention "car service," but the term was used by Congress in the Esch Car Service Act of 1917, ch. 23, 40 Stat. 101, amending the 1887 Act. According to its proponent Congressman Esch, the 1917 Act was enacted "in order to give the Interstate Commerce Commission full power and jurisdiction over the matter of car service" in light of critical freight car shortages and the fact that the Commission "did not (previously) have power to prescribe general rules relative to interchange of cars," 55 Cong.Rec. 2020 (1917).
 
 
 38
 "Car service" was defined in the Act consistent with its prior use in the railroad industry.
 
 
 39
 The term "car service" as used in this Act shall include the movement, distribution, exchange, interchange, and return of cars used in the transportation of property by any carrier subject to the provisions of this Act.
 
 
 40
 40 Stat. 101.
 
 
 41
 In 1920 the definition of the phrase "car service" was expanded to include the use not only of "cars," but of "locomotives," "vehicles," and "trains." Ch. 91, § 402, 41 Stat. 476.[10] That definition remained unchanged in content and form until the 1978 redefinition which made changes in form only. Also in 1920, the predecessor provision to section 11123(a)(2) was enacted, giving the Commission emergency power to direct car service. Ch. 91, § 402, 41 Stat. 476-77. Congressman Esch explained the proposed bill: "We also give the commission the right of treating each emergency as it arises and of also distributing cars and locomotives in order to meet such emergency." 58 Cong.Rec. 8316 (1919). We are persuaded that the term "car service" was used by Congress from the beginning to mean the interchange of cars and did not encompass the interchange of tracks.
 
 
 42
 In Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427 (1924), the Supreme Court interpreted the scope of the emergency powers give the Commission under the predecessor provision to section 11123. Ch. 91, § 402, 41 Stat. 476-77 (1920). The Commission there argued that its authority to "make just and reasonable directions with respect to car service" included the power to require one carrier to switch, by its own engine and over its own tracks, freight cars tendered by or for another carrier. The Supreme Court held that the Commission had exceeded its statutory authority because " 'car service' connotes the use to which the vehicles of transportation are put; not the transportation service rendered by means of them." Peoria, supra at 533, 44 S.Ct. at 196.
 
 
 43
 The Commission in its present order distinguished Peoria on the basis that there the carrier was unwilling to provide the switching service, while in this case both carriers support the Commission's order. The Commission also pointed to the language in Peoria stating that the purpose of former section 1(15) (now 11123) was to make "instrumentalities" of transportation, including "(c)ars and locomotives . . . tracks and terminals . . . available in emergencies to a carrier other than the owner . . .." Id., 263 U.S. at 533-34, 44 S.Ct. at 196 (emphasis added).
 
 
 44
 We do not agree with the Commission's reading of Peoria. Viewing the above-cited language in its context, it is clear that the Court's mention of tracks and terminals refers to subsection (c) of former section 1(15) which concern tracks and terminals and not subsection (b) which refers to car service and is at issue here.[11] After stating that the emergency provisions of the Act refer to instrumentalities rather than transportation services, the Court continued:
 
 
 45
 "Cars and locomotives, like tracks and terminals, are the instrumentalities. To make these instrumentalities available in emergencies to a carrier other than the owner was the sole purpose of sub-paragraphs (a ), (b ) and (c )." Id. at 533-34, 44 S.Ct. at 196.[12]
 
 
 46
 Recently, the Supreme Court stated "that car service rules dealt with the management of 'a single common pool' of cars 'used by all roads,' and that they pertain to railroad use of cars." ICC v. Oregon Pacific Industries, Inc., 420 U.S. 184, 187-88, 95 S.Ct. 909, 912, 43 L.Ed.2d 121 (1975) (quoting United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 743, 92 S.Ct. 1941, 1944, 32 L.Ed.2d 453) (emphasis added). In fact we have found no decision by any court which did not interpret "car service" to mean the interchange of cars. The Commission and SPT do cite two recent decisions of the Commission in which the Commission found an emergency to exist and authorized one carrier to operate over another carrier's tracks. Service Order No. 1394, 44 Fed.Reg. 48, 693 (1979); Service Order No. 1390, 44 Fed.R. 46, 278 (1979). We find those orders self-serving and unpersuasive.[13]
 
 
 47
 Finally we note that were we to give subsection 11123(a)(2) the broad reading suggested by respondents, that subsection would make unnecessary the other three subsections of section 11123(a). If the Commission were authorized in subsection (2) to permit one carrier to operate over another carrier's tracks, we fail to see why it could not under the same provision suspend car service rules and practices, require the joint use of tracks and terminals, and give direction for preference in transportation, embargoes, or movement of traffic under permits, all in the interest of promoting car service. It is settled that where a reasonable construction of a statute is possible which gives effect to all of its provisions, a statute will not be read to render some sections unnecessary. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307-08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-520, 99 L.Ed. 615 (1955).
 
 
 48
 In addition, the Supreme Court has decided that the emergency provisions are not to be given an expansive interpretation. Faced with the issue of interpreting former section 1(15)(b), the predecessor to section 11123(a)(2), the Court concluded that there is no "general grant of emergency power": "(T)he detail in which the subjects of such power have been specified precludes its extension to other subjects by implication." Peoria & Pekin Union Ry. Co. v. United States, supra, 263 U.S. at 534-35, 44 S.Ct. at 196.
 
 
 49
 As we read the statute, after considering its legislative history and sixty years of judicial interpretations, we are persuaded that section 11123(a)(2) was never intended to authorize the use by one carrier of a major segment of the main line tracks of another carrier. We therefore hold that section 11123(a)(2) does not provide authority for the Commission's order.
 
 IV
 
 50
 In its order, the Commission also relied on section 11123(a)(4), 49 U.S.C. § 11123(a)(4), authorizing the Commission to "give directions for . . . movement of traffic under permits." Respondents argue that the meaning of "permits" in section 11123(a)(4), 49 U.S.C. § 11123(a)(4), has never been judicially construed and that so long as the Commission's interpretation of "permits" to include the grant of authority to operate over another carrier's tracks is reasonable, we must defer to the agency's expertise. Petitioners contend that the Commission's power to issue "permits" has never and does not now include allowing carriers to operate over other carrier's lines. A "permit," they allege, as used both in the railroad industry and in subsection 11123(a)(4), is a term of art referring to the grant of authority which allows a shipment to enter a port or terminal which has been placed under an embargo.[14] When an embargo is placed or approved by the Commission, any traffic moving into the area may do so only under a "permit" or pass exempting it from the embargo. According to petitioners, the Commission has never before issued a permit, and cannot properly issue one, which in addition, allows the shipment to move by one carrier over another carrier's tracks.
 
 
 51
 After reviewing the history of section 11123(a)(4), we conclude that the Commission's reliance on that section was misplaced. We are persuaded that the word"permit" was intended to have the narrow meaning suggested by the petitioners and was not a general grant of power authorizing the Commission to issue a "permit" enabling one carrier to operate over another carrier's tracks.
 
 
 52
 Section 11123(a)(4) is a recodification without substantive change of a provision originally enacted as part of section 402 of the Transportation Act of 1920, ch. 91, § 402, 41 Stat. 476. That section authorized the Commission to "give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them." 41 Stat. 477. (emphasis added). The legislative history, although quite meager, supports the narrow interpretation advocated by petitioners. The only reference to the word "permits" appears in the following remarks made on the floor of the House of Representatives by Congressman Esch:
 
 
 53
 You know how the ports in New York, Boston, and Philadelphia were cluttered up with a vast congestion of freight during the summer of 1918 before the armistice was signed, and you remember how embargoes had to be issued way back to the interior where the commerce originated. This bill gives the Commission the right of levying embargoes to prevent goods moving to the port terminals and thus congest not only the port terminals but the sidings of tracks for 100 miles from the Harbor City. We give the Commission the right to issue permits for shipments for similar reasons.
 
 
 54
 58 Cong.Rec. 8316 (1919). (emphasis added.)
 
 
 55
 It is not disputed that in the years prior to the 1920 Act, the railroads had inaugurated a "permit system" to moderate the effects of certain embargoes. This court has stated that the history of the times when a statute is enacted may properly be considered to aid in our subsequent construction. Stern v. United States Gypsum, Inc., 547 F.2d 1329 (7th Cir.), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) (citing Great Northern Railway Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942)). In Baltimore Chamber of Commerce v. B & O R. R., 45 ICC 40, 41-42 (1917), the Commission itself stated:
 
 
 56
 The complaint in the present proceeding is directed particularly against certain embargoes, generally called "modified embargoes", declared by the Pennsylvania Railroad Company and the Philadelphia, Baltimore & Washington Railroad Company, hereinafter collectively termed the Pennsylvania, and the Western Maryland Railway Company, which provide, in effect, that grain will be accepted by those carriers for delivery at their export elevators in Baltimore only when the shipper shows, to the satisfaction of the carrier or its agent, that a vessel will be waiting at the port to receive the grain upon its arrival.
 
 
 57
 The practical operation of the present rule may be briefly described. If a Baltimore exporter desires to ship a quantity of grain in bulk from a western point to Baltimore, and is reasonably certain that he will have a ship ready when the grain arrives, he requests the designated agent of the carrier at Baltimore to permit him to make the shipment. If he is able to demonstrate to the agent's satisfaction that the ship will be in the harbor to receive the shipment, a numbered "permit" is issued which says, in effect, that the carrier will accept a specified number of cars to move to Baltimore from a designated point of origin. (emphasis added.)
 
 
 58
 Five years later, and after the 1920 enactment of the provision giving the Commission emergency power to "direct traffic under permits," 41 Stat. 476, the Commission again defined the "permit" system:
 
 
 59
 In Baltimore Chamber of Commerce v. B & O R. R. Co., 45 I.C.C. 40, we indicated our approval of the permit system, which creates what may be called a modified embargo, provided the permits were necessary and properly policed.
 
 
 60
 American Mfg. Co. v. Director General, 77 ICC 52, 56 (1922).
 
 
 61
 Petitioners refer us to Commission railroad decisions both prior and subsequent to the 1920 enactment of section 402(15) authorizing the Commission to "direct traffic under permits" and in every case the word "permit" is used by the Commission to indicate an exemption from an embargo. Smith v. Atlantic Coastline R. R. Co., 50 ICC 442 (1920); Timken Roller Bearing Co. v. Wheeling & Lake Erie Ry. Co. and Director General, 59 ICC 149 (1920); Dougherty & Co. v. Director General, 58 ICC 589 (1920); Maguire & Co. v. Director General, 61 ICC 658 (1921); America Lumber & Mfg. Co. v. Georgia R. R., 80 ICC 759 (1923); Maryland Coal & Coke Co. v. Baltimore & Ohio R. R. Co., 277 ICC 629 (1950); Commerce & Industry Assoc. of N. Y., Inc. v. Baltimore & Ohio R. R., 281 ICC 655, 692-93 (1951); Massey & Co., Inc. v. Southern Ry., 291 ICC 351 (1953). At the same time, we have not found a single decision by the Commission and none is cited by the respondents in which a "permit" allows one carrier to use another carrier's tracks or in which "permit" has any meaning other than an exemption from an embargo.
 
 
 62
 Respondents do cite some cases which they contend are authority for a broad interpretation of section 11123(a)(4), but we find those cases inapposite. In United States v. Michigan Portland Cement Co., 270 U.S. 521, 46 S.Ct. 395, 70 L.Ed. 713 (1926), a service order directing that preference and priority be given to coal shipments was challenged as beyond the statutory authority of the Commission. The Supreme Court held that subparagraph d of paragraph 15, 41 Stat. 477, a predecessor provision to 49 U.S.C. § 11123(a)(4), authorized the Commission to give directions for "preference in transportation," which included the furnishing, loading, consignment, and movement of cars. Nowhere does the Court state that the statutory section is to be broadly interpreted. In fact, the Court's prior decision in Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427 (1924), was cited in the opinion for the proposition that paragraph 15, now section 11123, "was strictly to be construed." United States v. Michigan Portland Cement Co., supra, 270 U.S. at 527, 46 S.Ct. at 397. Thus we find no support in that case for the Commission's broad interpretation of "permit" in the same section. Nor are either of the other cases of aid to respondents. In United States v. Thompson, 58 F.Supp. 213 (E.D.Mo.1944), the court referred to the Interstate Commerce Act as a "general" Act but it also stated that the Act should be "strictly construed." Supra at 217-18. The last case, Baltimore & Ohio R. R. v. Lambert Run Coal Co., 267 F. 776, 780 (4th Cir. 1920), aff'd on other grounds, 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922), simply held that the predecessor provision to section 11123(a)(4) permitted the Commission to suspend the ordinary rule for distribution of cars among coal mines.
 
 
 63
 We do agree with the Commission that the fact that "permit" has never before been interpreted to mean permission for one carrier to operate over the tracks of another does not in itself indicate a lack of statutory authority. It is also true that an administrative agency's broad responsibilities demand a generous construction of its statutory authority. Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In this case, however, we find that the Commission exceeded that authority when it relied on the "permits" language in section 11123(a)(4) to allow one carrier to operate over another carrier's tracks. A court does not defer to an administrative construction of a statute when there are "compelling indications that it is wrong." Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973), quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).
 
 
 64
 We are persuaded that the term "permits" in section 11123(a)(4) had become a term of art by the time of its enactment. It continued to have the same narrow meaning in the industry and in the Commission's decisions up to the time of the order at issue here. The Commission is not authorized to go beyond that specific meaning. Peoria & Pekin Union Ry. Co. v. United States, supra.[15] It is courts and not administrative agencies who are the final authorities on issues of statutory construction. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). We hold that the Commission erred in relying on the "under permits" language in section 11123(a)(4) for authority to issue its order.
 
 
 65
 Because the Commission's order was based on sections 11123(a)(2) and (4), it must be set aside. The case is remanded to the Commission for further proceedings consistent with this opinion.[16]
 
 
 
 [1]
 Petitioner railroads are the Atchison, Topeka and Santa Fe Railway Company, the Missouri-Kansas-Texas Railway Company, the Missouri Pacific Railroad Company, the Norfolk and Western Railway Company, and the Union Pacific Railroad Company
 
 
 [2]
 On February 8, 1980, hearings on the purchase application, docketed as Finance Docket No. 28799 (Sub. No. 1, et al.) St. Louis Southwestern Railway Company Purchase (Portion) William M. Gibbons, Trustee of the Property of Chicago, Rock Island & Pacific Railroad Company, Debtor, were concluded. A final decision is required by statute within six months of the close of the evidentiary record
 
 
 [3]
 Section 11125, 49 U.S.C. § 11125, authorizes the Commission to "direct the handling, routing, and movement of traffic available to (a) carrier and its distribution over the railroad lines of that carrier by another carrier to promote service in the interest of the public and of commerce" when the carrier "cannot transport the traffic offered to it because . . . its cash position makes its continuing operation impossible . . . ." 49 U.S.C. § 11125(a). An initial directed service order may not remain in effect for more than sixty days, but may be extended for an additional period of not more than 180 days "if cause exists." 49 U.S.C. § 11125(b)(1). A directed service carrier may apply for compensation, including "a reasonable profit." 49 U.S.C. § 11125(b)(5)(A)
 
 
 [4]
 In its directed service order, the Commission invited rail carriers to seek operating authority on a noncompensated basis:
 The issuance of this directed-service order does not preclude interested rail carriers (including the DRC (directed rail carrier)) from filing petitions with the Commission to operate all or part of the RI system on a noncompensated basis under 49 U.S.C. § 11123 . . . or similar provisions.
 
 
 [5]
 The extended directed service order was scheduled to expire on March 2, 1980. Subsequent to oral argument in this appeal, we were advised by petitioner RLEA that the Commission has further extended the period of directed service to 11:59 p. m. on March 23, 1980
 
 
 [6]
 After the Commission issued its order, SSW filed motions with the Commission seeking postponement, clarification and modification of the Commission's order. As of this date, SSW has not yet begun operating the Tucumcari line. On March 10, 1980, SSW notified the Rock Island that it will enter upon and operate the Tucumcari line as of March 24, 1980 at 12:01 a. m
 
 
 [7]
 49 U.S.C. § 11123 provides:
 Situations requiring immediate action
 (a) When the Interstate Commerce Commission considers that a shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in a section of the United States, the Commission may
 (1) suspend any car service rule or practice;
 (2) take action during the emergency to promote service in the interest of the public and of commerce regardless of the ownership (as between carriers) of a locomotive, car, or other vehicle on terms of compensation the carriers establish between themselves subject to subsection (b)(2) of this section;
 (3) require joint or common use of terminals, including mainline tracks for a reasonable distance outside of those terminals, on terms of compensation the carriers establish between themselves, subject to subsection (b)(2) of this section, when that action will best meet the emergency and serve the public interest; and
 (4) give directions for preference or priority in transportation, embargoes, or movement of traffic under permits.
 (b)(1) Except as provided in paragraph (2) of this subsection, the Commission may act under this section on its own initiative or on application without regard to subchapter II of chapter 103 of this title and subchapter II of chapter 5 of title 5.
 (2) When the carriers do not agree on terms of compensation under subsection (a)(2) of this section or on terms for joint or common use of terminals under subsection (a)(3) of this section, the Commission may establish for them in a later proceeding terms of compensation the Commission finds to be reasonable.
 
 
 [8]
 Included within sections 1 and 2 of Pub.L. 95-473 are the sections of the Interstate Commerce Act at issue here
 
 
 [9]
 The historical and revision notes which were contained in House Report "Judiciary Committee" No. 95-1395, July 26, 1978, refer to subsection (a)(2) only to point out that "the words 'take action' are substituted for 'make such just and reasonable directions' for clarity."
 
 
 [10]
 The term "car service" in this Act shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter
 
 
 [41]
 Stat. 476
 
 
 [11]
 That section authorized the Commission "to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest . . .." Subparagraph c of paragraph 15, § 402, 41 Stat. 477 (1920)
 
 
 [12]
 Earlier in its opinion, the Court stated: "Paragraph 15 deals in sub-paragraphs (a) and (b) with car service; in sub-paragraph (c) with the common use of terminals . . . . Nor does the order provide for the joint use of terminals under subparagraph (c); since it does not purport to authorize the Minneapolis & St. Louis to use the tracks and terminals of the Peoria Company." Id. at 532-33, 44 S.Ct. at 195-196
 
 
 [13]
 The first cited, Service Order No. 1394, granted one carrier authority to operate over another's tracks for .09 miles. The second, Service Order No. 1390, involved 167.2 miles of another carrier's tracks and is currently the subject of a petition for review pending in this court. Neither order specifies what particular section of the statute was relied on by the Commission
 At oral argument, the Commission brought to our attention a number of its car service orders which permit one railroad to operate over the tracks of another. The great majority of those orders are for sections of track of less than five miles, and none is for a section over eighty miles. In this case, nearly 1,000 miles of main line track is involved. Some of the orders were issued under authority other than that at issue here. In any case, these orders are self-serving. That the Commission issued such orders in the past even assuming that section 11123(a)(2) was relied on and that the orders authorized one carrier to operate over a sizeable portion of another carrier's track does not mean that the Commission had statutory authority to do so. "Nor does the existence of a prior administrative practice, even a well-explained one, relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority." Securities and Exchange Commission v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978).
 
 
 [14]
 An embargo is a prohibition against the movement of traffic into a particular area, generally because of extraordinary congestion at the receiving port or terminal
 
 
 [15]
 "Transportation Act 1920 evinces, in many provisions, the intention of Congress to place upon the Commission the administrative duty of preventing interruptions in traffic. But there is no general grant of emergency power to that end; and the detail in which the subjects of such power have been specified precludes its extension to other subjects by implication." Peoria & Pekin Union Ry. Co. v. United States, supra 263 U.S. at 534-35, 44 S.Ct. at 196
 
 
 [16]
 We express no opinion on the propriety of this order under any other provision of the Act or under any other statute